(No. 53635

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant,
v. LEONARD MYERS, Appellee.

*Opinion filed June 4, 1981.—Rehearing denied
October 19, 1981.*

Tyrone C. Fahner and William J. Scott, Attorneys General, of Springfield, and, Edward F. Petka, State's

Attorney, of Joliet (Melbourne A. Noel, Jr., and David Cassorla, Assistant Attorneys General, of Chicago, and John X. Breslin and Kenneth A. Wilhelm, of the State's Attorneys Appellate Service Commission, of Ottawa, of counsel), for the People.

Robert Agostinelli, Deputy Defender, and G. Joseph Weller, Assistant Defender, of the Office of the State Appellate Defender, of Ottawa, for appellee.

MR. JUSTICE UNDERWOOD delivered the opinion of the court:

Defendant, Leonard Myers, was convicted by a Will County jury of attempted murder, armed violence, armed robbery, and aggravated kidnaping. He received concurrent sentences of 20 years' imprisonment for each offense. The appellate court vacated the conviction and sentence for attempted murder and otherwise affirmed. (83 Ill. App. 3d 1073.) We granted the State's petition for leave to appeal from the reversal of the attempted-murder judgment.

Testimony of the State's witnesses, Melvin Schmidt, Kevin Jensen and Dr. William Sims, as to the following events was uncontradicted. On the night of June 15, 1978, three young men, Rick Landeen, Jensen, and Schmidt, were returning, in Jensen's Thunderbird, from a baseball game in Chicago. Jensen offered a ride to three men, Elijah Barfield, Jerry DeLooch, and the defendant, who were walking along I-55. The three accepted, and Jensen proceeded to deliver Landeen to his home in La Grange. The other five then continued, making one stop so that Jensen, Barfield, DeLooch, and defendant could steal some gas. The auto traveled generally southward, with Jensen driving, Schmidt in the right-front passenger seat, and the other three in the rear seat. Realizing that he would not have enough gas to reach his own home if he took the three hitchhikers any farther toward

their Joliet-Lockport destination, Jensen stopped the car near an I-55 interchange to let them out.

At that point, defendant, who was seated behind Schmidt, and who apparently had concealed in his clothing an old rusty machete with a blade approximately 10 to 12 inches in length, placed the machete against Schmidt's throat and held it there with his hands cupped, under-handed, cutting the neck almost immediately. Jensen then agreed to take the defendant farther and pulled onto I-55. Barfield, who was seated behind Jensen, held a gun to Jensen's head. Schmidt had instinctively grabbed defend-ant's wrists and struggled for approximately a minute in an attempt to pull the machete away from his throat, but submitted when defendant told him, "Get your hands down or I am going to cut your head off." After Schmidt lowered his hands, he testified that defendant started "yanking" even harder "twisting or working the knife into me." Defendant ignored Schmidt's ruse in requesting a cigarette, as well as his appeal that defendant put the knife down.

According to Jensen's testimony, the defendant twice moved the knife from Schmidt's throat in order to menace Jensen. Defendant, apparently fearing that consulting a map was intended to enable those in passing cars to see him with a knife at Schmidt's throat, first threatened Jensen with the knife when Jensen started to turn on the car's map light. Jensen did not turn on the light at that point, but both Jensen and Schmidt testified that, when Jensen later turned it on, defendant moved the knife from Schmidt's throat and cut Jensen's fingernail by "flicking" the knife across Jensen's thumb. Defendant then moved the knife back to Schmidt's throat and gave "a pretty hefty yank" on it. Schmidt asked the defendant if he could spit blood out the window, because it felt as if his throat was filling with blood, and he couldn't breathe. Although defendant refused permission, Schmidt tried to

spit anyway. Jensen then told defendant to take the car, "Just take it, let us off." Defendant, however, told Barfield, referring to Schmidt, to "Knock him out" or "Put him out." Barfield then struck Schmidt's head approximately six times with the gun, while defendant was vigorously "yanking" on Schmidt's throat with the knife. As the gun was taken from Jensen's head to strike Schmidt, Jensen heard air whistling through Schmidt's wound, indicating that the windpipe had been cut.

Defendant then ordered Jensen to drive off I-55 onto a highway, and onto a side road, and the car then began to run out of gas. Defendant lowered the knife from Schmidt's throat and asked for his wallet, which Schmidt gave him. Thereafter Schmidt used both hands to try to hold his neck together. The car stopped completely at a point on the road where some house lights were visible in the distance. Defendant then dragged Schmidt by the neck from the car, frisked him, and took him to the front of the car, Schmidt stumbling several times against it. There Schmidt leaned against Jensen, whom Barfield had forced to stand in front of the still-burning headlights. Defendant told Jensen and Schmidt, "Don't run towards the lights or you will be finished off."

Both Jensen and Schmidt testified that they had believed that Schmidt would die of his injuries. Schmidt testified that he had been "really woozy" and unable to walk to the lights. Since the cars on the road would not stop for them, Jensen finally jumped in front of one in order to stop it. Schmidt got into the car and asked to be taken to a hospital. At the hospital he was taken immediately to an operating room because of the seriousness of his injuries. The surgeon who treated him testified that he had suffered a 4½ inch wound, which was "gaping wide." The wound, which was approximately 5/8 inch to 3/4 inch deep at its deepest point, had opened Schmidt's windpipe, and, had it penetrated just a little more deeply,

would have hit the carotid artery and jugular vein. The surgeon testified that there was an immediate danger of suffocation from blood being taken into the lungs. It is apparent from the testimony and exhibits, including Schmidt's blood-soaked shirt and T-shirt and photographs of the interior and exterior of the car that he had lost a substantial amount of blood.

The definitions of the crimes of attempt, armed violence, and aggravated battery are relevant in our consideration of this case:

"Sec. 8—4. Attempt. (a) Elements of the Offense.

A person commits an attempt when, with intent to commit a specific offense, he does any act which constitutes a substantial step toward the commission of that offense." Ill. Rev. Stat., 1978 Supp., ch. 38, par. 8—4.

"Sec. 33A—2. Armed violence—Elements of the offense. A person commits armed violence when, while armed with a dangerous weapon, he commits any felony defined by Illinois Law." Ill. Rev. Stat., 1978 Supp., ch. 38, par. 33A—2.

"Sec. 12—4. Aggravated Battery.

(a) A person who, in committing a battery, intentionally or knowingly causes great bodily harm, or permanent disability or disfigurement commits aggravated battery.

(b) A person who, in committing a battery either:
(1) Uses a deadly weapon;
* * *
commits aggravated battery.
***
(d) Sentence.

Aggravated battery is a Class 3 felony." Ill. Rev. Stat. 1977, ch. 38, par. 12—4.

The appellate court held that the attempted murder here was a lesser included offense in the armed-violence charge, a holding which the parties and we agree is incorrect. Regardless of whether attempted murder is ever a lesser included offense of armed violence (see *Blockburger v. United States* (1932), 284 U.S. 299, 76 L. Ed. 306, 52

S. Ct. 180; *Gore v. United States* (1958), 357 U.S. 386, 2 L. Ed. 2d 1405, 78 S. Ct. 1280; *Illinois v. Vitale* (1980), 447 U.S. 410, 65 L. Ed. 2d 228, 100 S. Ct. 2260), it clearly was not so here (*People v. Smith* (1980), 78 Ill. 2d 298, 306; *People v. Vriner* (1978), 74 Ill. 2d 329, 346-47, *cert. denied* (1979), 442 U.S. 929, 61 L. Ed. 2d 296, 99 S. Ct. 2858). The armed-violence conviction here was based upon the underlying felony of aggravated battery, which does not require proof of the intent to kill necessary for the attempted-murder conviction. *People v. Trinkle* (1977), 68 Ill. 2d 198.

While defendant does not claim any violation of double jeopardy principles, the case does present a question whether defendant's behavior, under the doctrine of *People v. King* (1977), 66 Ill. 2d 551, *cert denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273, can support convictions and concurrent sentences for attempted murder and for armed violence based on aggravated battery. Defendant argues that both offenses were based on the same physical act, the cutting of Schmidt's neck. In *King,* this court stated:

> "Prejudice results to the defendant only in those instances where more than one offense is carved from the same physical act. Prejudice, with regard to multiple acts, exists only when the defendant is convicted of more than one offense, some of which are, by definition, lesser included offenses. Multiple convictions and concurrent sentences should be permitted in all other cases where a defendant has committed several acts, despite the interrelationship of those acts. 'Act,' when used in this sense, is intended to mean any overt or outward manifestation which will support a different offense. We hold, therefore, that when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by de-

finition, lesser included offenses, convictions with concurrent sentences can be entered." (66 Ill. 2d 551, 566.)

In *King* this court abandoned the "independent motivation" test with respect to multiple convictions and concurrent sentences (see *People v. Scott* (1977), 69 Ill. 2d 85) and effectively broadened the circumstances under which they could be imposed. (Compare *People v. Stewart* (1970), 45 Ill. 2d 310.) As long as there are multiple acts as defined in *King,* their interrelationship does not preclude multiple convictions and the imposition of concurrent sentences based upon them. For example, one "stickup," involving armed robbery of several victims, supports multiple convictions. *People v. Thomas* (1977), 67 Ill. 2d 388.

According to Jensen, the defendant moved the knife from Schmidt's neck twice while threatening Jensen. The distinctness of the first movement is unclear. However, it would seem logical that it amounted to a physical act, since the fact that Jensen felt sufficiently menaced that he did not turn on the light indicates the action would have supported an assault conviction (Ill. Rev. Stat. 1977, ch. 38, par. 12–1). In any event, the record is clear from testimony of both Jensen and Schmidt that, when Jensen did turn on the map light, defendant moved the knife a sufficient distance from Schmidt's throat to cut Jensen's fingernail. That movement clearly amounted to "an overt or outward manifestation sufficient to support a different offense," since the cutting necessarily involved a movement of some distance and would support a charge of battery (Ill. Rev. Stat. 1977, ch. 38, par. 12–3). Each movement toward Jensen interrupted the attack on Schmidt. Since the movement toward Jensen was a distinct physical act, there were at least two physical acts with respect to Schmidt.

Further, both the movement of the knife from Jen-

sen's fingernail to Schmidt's throat, and the subsequent "pretty hefty yank" on the neck, which the jury could reasonably conclude was the blow which severed the windpipe, were sufficient to constitute physical acts separate from the first cut on Schmidt's neck. Two separate invasions of Schmidt's body, even though closely related by reason of the fact that they attacked the same area of his body and were close in time, were not one physical act. If a jury believes that a defendant wounds a victim, then, after an intervening attack on a third person, attacks the original victim again, whether there is only one physical act cannot depend, as defendant implies, upon whether the defendant was careful to insert the knife through the same open wound.

Defendant also contends that it was not proved beyond a reasonable doubt that he intended to kill Schmidt. As earlier noted, a conviction for attempted murder must be supported by proof that the defendant had a specific intent to kill the victim. The instructions in the present case, to which no objection has been raised, adequately informed the jury of that requirement. *People v. Barker* (1980), 83 Ill. 2d 319; *People v. Jones* (1979), 81 Ill. 2d 1.

The specific intent to kill, a state of mind, may be shown by circumstances. (*People v. Barker* (1980), 83 Ill. 2d 319; *People v. Jones* (1979), 81 Ill. 2d 1; *People v. Koshiol* (1970), 45 Ill. 2d 573.) Here, the jury could have concluded from the testimony and exhibits that the defendant believed, as did Jensen and Schmidt, that Schmidt would bleed to death from his injuries and that defendant had done all that was necessary to achieve that result. (See *Zickefoose v. State* (1979), —— Ind. ——, 388 N.E.2d 507.) Or, possibly, the jury could have accepted the argument that the machete was so dull and rusty that defendant found it difficult to accomplish his purpose and did not want to use Barfield's gun because of the possibility

of attracting attention. Or the jury might have regarded defendant as a sadist who preferred leaving his victim to suffocate or bleed to death, a not inconceivable situation in view of the evidence. In *Jones* even instructions containing error with respect to specific intent were held harmless, because the intent to kill was blatantly evident from circumstances, including the fact that the victim was shot four times in the back of the head. While it may be argued that four shots in the victim's head are more clearly indicative of intent to kill than is cutting the victim's throat and leaving him, with a cut windpipe, bleeding severely, and without transportation on a side road at night, the latter evidence is, in our opinion, ample to warrant a properly instructed jury inferring that defendant had formed the intent to kill Schmidt.

Even if it could be shown that the defendant did, at the end of the incident, abandon his intent to kill Schmidt, that would not affect our decision. There is no indication that the rule in Illinois is not in accord with the majority rule (*State v. Workman* (1978), 90 Wash. 2d 443, 450, 584 P.2d 382, 386; *State v. Thomas* (Mo. 1969), 438 S.W.2d 441; *Howard v. Commonwealth* (1966), 207 Va. 222, 148 S.E.2d 800; 21 Am. Jur. 2d *Criminal Law* sec. 110 (1965), 22 C.J.S. *Criminal Law* sec. 76 (1961)) that once the elements of attempt are complete, abandonment of the criminal purpose is no defense. *People v. Hiller* (1955), 7 Ill. 2d 465, 470; *People v. Davis* (1979), 70 Ill. App. 3d 454, 456. See *People v. Kruse* (1943), 385 Ill. 42, *cert. denied* (1946), 328 U.S. 874, 90 L. Ed. 1644, 66 S. Ct. 1380; *People v. Anderson* (1943), 382 Ill. 316; *People v. Lardner* (1921), 300 Ill. 264.

Defendant also, on the basis of the arguments presented to us in *People v. Haron* (1981), 85 Ill. 2d 261, asserts the unconstitutionality of the armed-violence statute, alleging it violates the due process clauses of both the Federal and State constitutions. That issue, however, was not

reached by us in *Haron,* and in this case was not presented to either the trial or appellate courts. It has, therefore, been waived. *People v. Williams* (1977), 66 Ill. 2d 179.

The judgment of the appellate court is accordingly reversed insofar as it vacated the conviction and sentence for attempted murder; it is affirmed insofar as it affirmed the other convictions and sentences. The judgment of the circuit court of Will County is affirmed.

*Appellate court affirmed in part*
*and reversed in part; circuit*
*court affirmed.*