THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. IVORY TOWNES, Defendant-Appellant.

Fourth District No. 4—84—0008

Opinion filed February 7, 1985.

Daniel D. Yuhas and John J. Hanlon, both of State Appellate Defender's Office, of Springfield, for appellant.

Edward Litak, State's Attorney, of Danville (Robert J. Biderman and Denise M. Paul, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

PRESIDING JUSTICE GREEN delivered the opinion of the court:

On September 9, 1983, following a jury trial in the circuit court of Vermilion County, defendant, Ivory Townes, was convicted of two counts of attempted murder, two counts of home invasion, and one count each of rape, robbery, and deviate sexual assault. (Ill. Rev. Stat. 1983, ch. 38, pars. 8—4, 12—11, 11—1, 18—1, and 11—3.) Defendant was sentenced to extended terms of 60 years' imprisonment on the attempted murder, home invasion, rape, and deviate sexual assault convictions, and to seven years on the robbery conviction. The sentences on the attempted murder convictions were ordered to run consecutively to the remaining sentences, which were to run concurrently with each other.

On appeal, defendant contends that: (1) he was not proved guilty beyond a reasonable doubt; (2) the trial court erred by denying defendant's motion for change of place of trial; (3) the court erred during *voir dire* by refusing defendant's challenge for cause of one juror and by insufficiently examining another juror regarding exposure to pretrial publicity; (4) defendant's right to an impartial jury was denied by the prosecutor's peremptory challenge of the only three prospective black jurors; (5) the court erred by admitting evidence seized from defendant's apartment following his arrest; and (6) the court erred by admitting evidence of defendant's refusal to comply with a

search warrant to compel the taking of body specimens. We affirm.

As defendant has challenged the sufficiency of the evidence supporting his convictions, it is necessary to recite the facts of this case in some detail.

The complaining witnesses in this case, John and Jacqueline Hazel, husband and wife, lived in a second-floor apartment in Danville. Mr. Hazel testified that he was awakened about 12:30 or 12:45 a.m. the morning of June 8, 1983, by noises in the kitchen of the Hazels' apartment. Upon investigation, Mr. Hazel discovered a black man standing inside the kitchen door whom he described as being about 5 feet 9 inches tall, weighing about 160 to 165 pounds, and whom he identified in court as being the defendant. The intruder was wearing blue jeans and a light blue shirt and had a plastic "perm cap" (or shower cap) on his head and a slight amount of facial hair; he was not wearing eyeglasses.

The intruder first stated he was looking for a party and then demanded to use a telephone, but was told that there was no phone in the apartment. When the intruder advanced into the apartment, Mr. Hazel and Jacqueline Hazel, who had been awakened by voices and had joined her husband, attempted to push the intruder out of the kitchen door, and a scuffle ensued during which the intruder struck Mr. Hazel in the right eye and Mr. Hazel sustained serious lacerations on his wrist from broken glass on the kitchen door. The intruder sprayed the Hazels' faces with a substance which temporarily blinded them. Mr. Hazel was not wearing his glasses during the incident.

The kitchen was illuminated by the light emanating from the television in the living room and by a small fluorescent light over the kitchen sink. Initially, the only other light in the apartment was provided by a neon beer sign which was located about eight or 10 feet away from the dining room window.

After subduing the couple, the intruder forced Mr. Hazel into an unlocked bedroom closet where he remained for 30 to 40 minutes. During this period Mr. Hazel heard the intruder striking Mrs. Hazel and demanding money. At one point Mr. Hazel handed out his wallet, which contained no money, to the intruder.

Mr. Hazel thereafter heard water running in the bathroom and was forced to get into the filled bathtub, where Mrs. Hazel was already standing. The intruder then handed Mr. Hazel an electric massager, which was attached to an extension cord plugged into an outlet over the sink, and told Mr. Hazel to drop it into the bathwater. Mr. Hazel did so and received a slight shock.

During this period the bedroom lights shined into the bathroom.

The intruder stood inches away from the Hazels. Mr. Hazel's right eye was swollen shut, but he had vision in his left eye; the blinding effect of the substance which was sprayed in his face had largely worn off.

During the bathroom episode, Mr. Hazel was still bleeding profusely from his wrist wounds. He asked the intruder to give him something to wrap around his wrist to stop the bleeding, and the intruder provided a pair of Mr. Hazel's blue jeans. The intruder also advised Mr. Hazel to seek medical attention for the wounds, which he told Mr. Hazel to say were the result of an accident. After threatening to kill the Hazels if they contacted the police, the intruder left the apartment. The Hazels later discovered that in addition to the wallet, two sets of keys were missing, including a set which fit locks at Danville Beverage, where Mr. Hazel was employed. Mr. Hazel estimated that the incident lasted 1½ to 1¾ hours.

Jacqueline Hazel also testified for the State, and much of her testimony coincided with that of her husband. In court, she identified defendant as the intruder. After her husband was forced into the bedroom closet, she dumped out the contents of her purse on the living room table in an attempt to satisfy the intruder's demands for money. Although she was struck repeatedly in the face and had been sprayed twice by this time, she was able to observe the intruder in the lighted living room while he was examining the contents of her purse. She particularly noticed the intruder's "drooping eyelids." Mrs. Hazel normally wore eyeglasses to read but was not wearing them during the incident.

Mrs. Hazel attempted to escape the apartment by running down the outside stairs, but the intruder caught up with her at the bottom and threw her to the ground. At this point her vision was not impaired, and the area was lighted by an outside beer sign. The intruder dragged Mrs. Hazel back into the apartment and turned on the bath water. The light in the bedroom was off, but the bathroom light provided some illumination. The intruder forced Mrs. Hazel to engage in fellatio and then in intercourse on the bedroom floor, while her husband remained in the bedroom closet.

Mrs. Hazel recalled that after the intruder had obtained an extension cord and forced the Hazels to stand in the bath water, the electric massager was dropped in the bathtub twice; she was unsure of who dropped it in the second time. While in the unlighted bathroom, Mrs. Hazel could see the intruder "real good" because the lights were on in the adjoining bedroom.

After the Hazels notified police of the incident, they were taken

to the hospital, where they were treated for their injuries. A vaginal swab was taken from Mrs. Hazel which revealed the presence of sperm. Further testing by a State forensic serologist indicated that the sperm could have been donated by defendant.

Each of the victims subsequently identified defendant as the intruder, first in photographic identification sessions conducted on June 8, 1983, and later in corporeal lineups. An investigator with the Danville police department testified that he conducted a photographic identification session with the Hazel couple in their apartment on June 8, 1983. Mr. Hazel examined 790 photographs of black males over a period of about 1½ hours while his wife was being interviewed in another room. Mr. Hazel selected the photograph of defendant, which was the last one in the group, and stated that he was positive that it was the intruder. Mr. Hazel also testified at trial that he was positive at the time that his identification was correct. After Mr. Hazel left the room, Mrs. Hazel examined approximately 200 photographs before selecting a picture of defendant as the intruder.

Another Danville police investigator testified that he was present at a lineup conducted on June 9, 1983, for Mr. Hazel. After several minutes, during which Mr. Hazel eliminated three of the five subjects, Hazel identified defendant as the intruder. Hazel testified at trial that he was looking in the lineup for the person whose picture he had previously selected, but stated he was positive of his identification. On June 14, 1983, a lineup of the same five subjects was conducted for Mrs. Hazel. Mrs. Hazel viewed the lineup for about five minutes before selecting defendant, stating "I believe that's him." Mrs. Hazel also testified that she was positive of this identification.

Two keys which were taken from the Hazels' apartment were recovered by the Danville police. A workman testified that he found two keys on June 8, 1983, while repairing the roof of a Georgetown building and turned them over to a Danville police officer who was searching the area. The Danville chief of police testified that he was searching the area around defendant's apartment on June 8, 1983, for items taken from the Hazels' apartment when some workmen inquired if he was looking for keys. He was given two keys, which one of the men stated had been found on the roof of a building approximately 75 feet away from defendant's residence. Mr. Hazel identified the keys at trial as the ones which were taken from his apartment. Police determined that the keys fit locks at Danville Beverage, where Mr. Hazel was employed.

Ivory Townes' defense consisted almost entirely of the testimony of Debra Nelson, defendant's girlfriend, with whom he lived; defend-

ant did not testify in his own defense. Nelson testified that defendant picked her up from work at midnight on June 7, 1983, after which they drove around Danville and returned to the apartment which they shared in Georgetown at about 1:45 a.m. She stated that no one left the apartment after they returned. Nelson stated that defendant was wearing a brown shirt and green pants on the night in question.

Defendant contends that the evidence was insufficient to prove his guilt of any offense beyond a reasonable doubt because of weakness in the proof that he was the intruder. He also maintains that the evidence that the intruder intended to kill either of the Hazels was too weak to support the attempted murder convictions.

We examine first the issue of the identification testimony. The test for this type of testimony is whether the witness was close enough to the accused for a sufficient length of time under conditions adequate for observation. (People v. Brown (1982), 110 Ill. App. 3d 1125, 443 N.E.2d 665.) More particularly, consideration should be given to (1) the opportunity of a witness to observe the accused at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the time of the identification; and (5) the length of time between the crime and the identification. Neil v. Biggers (1972), 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375.

According to Mr. Hazel, the episode lasted for approximately 1½ to 1¾ hours. During this time both victims had ample opportunity to observe the intruder. The first opportunity came when the Hazels confronted the intruder in the kitchen, which was lighted by a small fluorescent light over the sink, as well as the light from the TV in the living room and from the outside beer sign. Additional opportunities were afforded when Mrs. Hazel dumped out her purse in the lighted dining room, when she attempted to escape the apartment but was caught by the intruder in an outside area illuminated by the beer sign, and when the intruder sexually attacked her in the bedroom, at which time a bathroom light provided illumination. During the bathroom episode, light was provided from the bedroom, and the Hazels both observed the intruder at close range. Although neither of the Hazels wore their eyeglasses during the incident, both testified that they required glasses only to read or see clearly at close range.

As to the second factor, the circumstances of the incident were such that the victims would have been attentive to the features of the intruder. Mrs. Hazel particularly noticed the intruder's "drooping eyelids." Mr. Hazel described the intruder's clothing and the "perm cap" which he wore; this latter description was corroborated by the testi-

mony of other witnesses at trial who saw defendant prior to the incident.

As regards to the third factor, defendant cites the discrepancy between Mr. Hazel's initial description of the intruder and defendant's actual height and weight—a discrepancy of some three inches and 30 pounds. This discrepancy can only be characterized as minor (see *People v. Brown* (1982), 110 Ill. App. 3d 1125, 443 N.E.2d 665), and the Hazels' descriptions were in all other regards accurate.

Fourth, the Hazels' identifications of defendant at the photo display and at the later lineups were unequivocal. The testimony of a Danville police investigator verified the Hazels' own testimony regarding the certainty of their identifications. Finally, the Hazels selected the defendant's photograph from among hundreds on the same day of the incident. Mr. Hazel identified defendant at the lineup one day later; the lineup for Mrs. Hazel was conducted six days later. Thus there was not a significant passage of time which would cloud the victims' memories of the intruder's features.

Moreover, there was substantial evidence corroborating the Hazels' identifications. Testimony from a forensic serologist established that blood on the shoes defendant was wearing when arrested was of the same blood type as Mrs. Hazel's blood. The sperm tested from the vaginal swab could have been donated by defendant. Two keys stolen from the Hazel's apartment were found 75 feet away from the defendant's residence.

The foregoing testimony fully refutes defendant's contention that the victims' identifications were unreliable because the Hazels' ability to observe the intruder was hampered by the substance sprayed in their eyes, by injuries to their eyes, by the "poor lighting conditions," and by their failure to wear eyeglasses. The proof that defendant was the invader was strong and fully sufficient for a reasonable juror to find beyond a reasonable doubt that this was so.

■ Attempted murder is committed when a person, with specific intent to kill, performs any act which constitutes a substantial step towards the commission of murder. (Ill. Rev. Stat. 1983, ch. 38, par. 8—4(a); *People v. Harris* (1978), 72 Ill. 2d 16, 377 N.E.2d 28.) Such specific intent can rarely be proved by direct evidence but may be inferred from the surrounding circumstances, such as the character of the assault and the use of a deadly weapon. *People v. Koshiol* (1970), 45 Ill. 2d 573, 262 N.E.2d 446, *overruled on other grounds by People v. Nunn* (1973), 55 Ill. 2d 344, 349, 304 N.E.2d 81, 84.

The attempted murder charges arise from the intruder's conduct in requiring the Hazels to stand in the bath water and then requiring

Mr. Hazel to drop an operating electrical massager into the water. The danger of electricity is common knowledge to all persons of ordinary intelligence and experience. (*Miscevich v. Commonwealth Edison Co.* (1982), 110 Ill. App. 3d 400, 442 N.E.2d 338.) Because of the obviously great danger resulting from the act of Mr. Hazel required by the intruder, the jury could infer that the intruder intended to kill the Hazels. (*People v. Koshiol* (1970), 45 Ill. 2d 573.) The obvious motive for intending to kill the Hazels would be to prevent them from testifying against him. The intruder's removal of certain objects that might have borne his fingerprints would indicate that he was thinking of eliminating evidence that might convict him. The fact that the intruder both ran the water well ahead of the time that he required Mr. Hazel to drop the massager in the tub and then sought out an extension cord so that the power line to the massager would reach the tub indicates that the intruder acted with premeditation. Also of relevance is the defendant's warning, after the unsuccessful attempt, that he would return and kill the Hazels if they notified the police.

Defendant contends that evidence that he complied with Mr. Hazel's request for something to wrap his wounds and advised Mr. Hazel to seek medical attention indicates a concern inconsistent with an intent to murder the Hazels. However, these actions followed the bathtub episode and are not conclusive of defendant's intent at the time he ordered Mr. Hazel to drop the massager in the bathtub. Evidence that defendant may have vacillated in his desire to kill the Hazels is not compelling, since once the elements of attempt are established, abandonment of the criminal purpose is no defense. *People v. Myers* (1981), 85 Ill. 2d 281, 426 N.E.2d 535.

As with the question of the proof of identification, a reasonable jury could have determined beyond a reasonable doubt that the intruder intended to kill both of the Hazels.

■ The next two issues raised by defendant are interrelated; both involve the underlying question of whether pretrial publicity of the instant case and of defendant's prior convictions on similar charges was so prejudicial as to affect his right to a fair trial before an impartial jury. Defendant first claims that the trial court erred by denying his motion for change of place of trial made before trial and renewed during *voir dire*. Second, defendant argues that the court erred by impanelling one juror who was exposed to information concerning defendant's prior convictions during *voir dire* and by seating another juror without individually examining that juror regarding his exposure to pretrial publicity and any resulting prejudice towards defendant.

Prior to trial, defendant filed a motion for change of place of trial pursuant to section 114—6 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 114—6). The motion alleged that publicity concerning defendant's prior convictions and relating to the pending charges, including newspaper, radio, and television accounts, resulted in such prejudice against defendant that he could not receive a fair trial in Vermilion County. The trial court denied this motion, after hearing arguments at the pretrial hearing, but indicated a willingness to entertain the motion again during *voir dire* proceedings in the event that additional information bearing on the issue became available. Defendant did in fact renew his motion on September 7, 1983, during *voir dire*, after it became evident that several prospective jurors had been exposed to some publicity regarding defendant's prior convictions and the pending case against him; the motion was again denied.

In support of the written motion for change of venue, several newspaper articles from the Danville Commercial News were attached. These articles dated back to April 30, 1980, when defendant was on trial for rape, deviate sexual assault, and home invasion. Defendant's convictions for these crimes were reversed and remanded by this court on March 31, 1981 (*People v. Townes* (1981), 94 Ill. App. 3d 850, 419 N.E.2d 604), and the reversals were upheld by the Illinois Supreme Court on April 16, 1982 (*People v. Townes* (1982), 91 Ill. 2d 32, 435 N.E.2d 103, *cert. denied* (1982), 459 U.S. 878, 74 L. Ed. 2d 143, 103 S. Ct. 174). Shortly before defendant was to be retried, the Vermilion County State's Attorney's office decided to move for the dismissal of the charges against Townes, citing the lack of admissible evidence. Both of these decisions were reported in the Commercial News.

Defendant also referred in his motion to purportedly prejudicial radio and television broadcasts; however, such broadcasts are not documented in the motion or anywhere else in the record. Moreover, only one of the prospective or actual jurors exposed to publicity regarding the charges or prior convictions identified such broadcasts as the source of the information.

Section 114—6 of the Code of Criminal Procedure of 1963 provides in pertinent part:

"A defendant may move the court for a change of place of trial on the ground that there exists in the county in which the charge is pending such prejudice against him on the part of the inhabitants that he cannot receive a fair trial in such county." (Ill. Rev. Stat. 1983, ch. 38, par. 114—6.)

The rule in Illinois is that a defendant is entitled to a change of place of trial when, as a result of adverse pretrial publicity, it appears that there are reasonable grounds to believe that the prejudice alleged by defendant actually exists and, as a result, there is a reasonable apprehension that the accused cannot receive a fair and impartial trial. *People v. Williams* (1968), 40 Ill. 2d 522, 240 N.E.2d 645, *cert. denied* (1969), 393 U.S. 1123, 22 L. Ed. 2d 129, 89 S. Ct. 1004.

The United States Supreme Court stated in the landmark case of *Irvin v. Dowd* (1961), 366 U.S. 717, 723, 6 L. Ed. 2d 751, 756, 81 S. Ct. 1639, 1642-43:

"To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."

Similar sentiments have been expressed in many other cases. See *People v. Farris* (1980), 82 Ill. App. 3d 147, 402 N.E.2d 629.

Here, in addition to the normal reportage of facts concerning the offenses in issue, newspaper articles cited by defendant contained articles concerning defendant's prior convictions of other similar crimes and the history of that prior litigation. This information would not have been admissible at trial. However, we do not deem these stories or other matters brought to public attention sufficient to establish community prejudice against defendant or to have deprived him of a fair trial. The publicity was not particularly voluminous or pervasive despite defendant's attempts to characterize it as such. Over two months passed between the last report of defendant's prior convictions and the date scheduled for *voir dire*. Moreover, the news accounts were accurate and noninflammatory. The mere fact that pretrial publicity includes references to a defendant's past crimes is not sufficient to presume bias on the part of prospective jurors. *People v. Gendron* (1968), 41 Ill. 2d 351, 243 N.E.2d 208, *cert. denied* (1969), 396 U.S. 889, 24 L. Ed. 2d 164, 90 S. Ct. 179; *People v. Campbell* (1975), 28 Ill. App. 3d 480, 328 N.E.2d 608.

The recent Illinois Supreme Court decision in *People v. Taylor* (1984), 101 Ill. 2d 377, 462 N.E.2d 478, also involved pretrial publicity of inadmissible and prejudicial information concerning the defendant's failure to "pass" a polygraph examination, contrasted with the dismissal of charges against a codefendant who also took a polygraph. The news coverge was "unprecedented" and included frequent articles in two area newspapers as well as daily radio and television broad-

casts.

*Voir dire* in the *Taylor* case lasted three days, and virtually all of the prospective jurors had some prior knowledge of the case. Of the 12 eventual jurors, six were aware that the codefendant had been released. Five of these were seated over defendant's challenges for cause, and two of the five were seated after defendant had exhausted his peremptory challenges. The trial judge twice denied defendant's motion for a change of place of trial, denied many of defendant's challenges for cause, and denied defendant's motion for additional peremptory challenges.

The *Taylor* court found that under these circumstances the jurors' bare assertions that they could set aside any preconceived notions of the defendant's guilt were insufficient. The trial court erred by refusing to allow a change of venue when the widespread knowledge of prejudicial and inadmissible information became evident during *voir dire*. The trial court also erred by refusing challenges for cause as to jurors who had been exposed to the publicity.

The *Taylor* court reaffirmed the standard of review established in *People v. Yonder* (1969), 44 Ill. 2d 376, 388, 256 N.E.2d 321, 328:

> "Our basic consideration here is not necessarily the correctness of the trial court's rulings on the defendants' motions for change of venue \*\*\*, but whether upon the record as a whole the defendants received a trial before a fair and impartial jury since these rulings were proper if defendants actually received such a trial."

The court reiterated that examination of prospective jurors' exposure to prejudicial publicity undertaken during *voir dire* was the best method of determining whether they can set aside any bias and decide the case based solely upon the evidence at trial.

Applying the *Taylor* standard, an examination of the whole record reveals that defendant received a fair trial before an impartial jury. The trial court was well aware of the potential for juror prejudice and expressed his intention to liberally allow defendant's challenges for cause of those jurors exposed to information regarding defendant's prior convictions. The veniremen were admonished at the outset of *voir dire*, and repeatedly throughout the examination process, that they were required to set aside any prior knowledge of the case and decide the issue of defendant's guilt solely on the evidence presented.

Of the 36 veniremen examined in all (three as alternate jurors), 14 had never heard or read of the case. The majority of those with some familiarity of the case expressed only a dim recollection or sketchy knowledge of the facts. Of the 20 veniremen who expressed some

prior knowledge, only three indicated that they might have formed opinions as to defendant's guilt. Of the 12 eventual jurors, eight had no prior knowledge of the case. The other four jurors related only a generalized or vague knowledge, and each affirmed that he could set aside any knowledge or bias and decide the case solely on the evidence.

Other factors in the instant case serve to distinguish it from *Taylor*. Chief among these is the fact that defendant did not find it necessary to exhaust his peremptory challenges before jury selection was completed. Further, defendant exercised only two challenges for cause, only one of which was exercised on the grounds of pretrial publicity.

*Irvin* and its progeny require only a determination that the jurors exposed to pretrial publicity are able to set aside any resulting opinions or impressions and render a verdict solely on the evidence. It is apparent that the trial judge below used even a stricter standard by excusing, *sua sponte*, those jurors who indicated that they had formed such an opinion. (See *People v. Driver* (1978), 60 Ill. App 3d 381, 376 N.E.2d 803.) In summary, it cannot be said that the trial court clearly abused its discretion in denying defendant's motions for a change of place of trial. See *People v. Myers* (1974), 20 Ill. App. 3d 83, 312 N.E.2d 741.

■ Defendant next contends that the impaneling of two particular jurors, Livesay and Soloman, deprived him of his right to a fair trial before an impartial jury. Specifically, defendant complains that juror Livesay was prejudiced by her exposure to information that defendant has previously been convicted of rape and that juror Soloman was not individually examined regarding his prior knowledge of the case.

As to juror Livesay, defendant argues that her exposure to another venireman's recollection that defendant had previously been convicted of rape denied defendant his right to an impartial jury. The venireman's revelation came about as a result of defense counsel's continued examination of the venireman bringing out the details of the information he had concerning the defendant's previous trial and reversed conviction. The trial court dismissed the venireman for cause but refused to dismiss, for cause, the other three members of the panel. The defense then exercised peremptory challenges as to two of the panelists but left Livesay on the panel. The failure to exhaust all peremptory challenges precludes defendant from asserting prejudice in Livesay's presence on the jury. (*People v. Ford* (1960), 19 Ill. 2d 466, 168 N.E.2d 33, *cert. denied* (1960), 364 U.S. 848, 5 L. Ed. 2d 72,

81 S. Ct. 93; *People v. Feagans* (1983), 118 Ill. App. 3d 991, 455 N.E.2d 871.) Furthermore, the record does not establish any indication that Livesay could not have put any prejudicial information she had out of her mind and decided the case upon the basis of the matters properly before her. Defense counsel could have examined her on this issue.

■ Similarly, defense counsel could have examined Soloman about any prejudices he might have had but did not do so. Defendant has the burden of showing that a juror is prejudiced. (*People v. Cole* (1973), 54 Ill. 2d 401, 298 N.E.2d 705.) No such showing was made here. Soloman did answer affirmatively when asked whether he would hear all the evidence before deciding whether defendant was guilty of any offense. Soloman also stated there was no reason to prevent him from being fair. No error resulted from the presence of Soloman on the jury.

■ Next, defendant asserts that he was denied his right to a jury drawn from a fair cross-section of the community by the prosecutor's peremptory challenge of the only three prospective black jurors. This issue is controlled by the decision in *People v. Williams* (1983), 97 Ill. 2d 252, 454 N.E.2d 220, which held that prosecutorial use of peremptory challenges to exclude blacks does not raise a constitutional issue unless there is a systematic and purposeful exclusion of blacks in case after case. Defendant here does not attempt to make such a showing. Moreover, each of the three black veniremen excluded from defendant's jury had contacts with defendant's family or with potential defense witnesses. Thus it appears that there were legitimate reasons unrelated to the race of the veniremen for excluding them. Consequently, defendant's argument in this regard is without merit.

■ Another claim of error by defendant arises from the trial court's refusal to suppress two items of defendant's clothing. It is uncontroverted that these items were initially seized pursuant to defendant's valid consent to search the apartment where he lived with his girlfriend. The issue arises because, after seizing these items, the police officers forgot to remove them after the search was completed, necessitating a second entry of the apartment without defendant's express authorization.

Initially, we note that any error in the ruling on the motion to suppress was harmless beyond a reasonable doubt. No testimony was presented by the State that the intruder was wearing that clothing at the time of the offense. Rather, that evidence corroborated defense testimony as to what defendant was wearing on that evening.

In any event, the slight intrusion upon the privacy of the defend-

ant to take possession of that clothing shortly after its possession had previously been obtained by consent was, as the trial court found, justified by limited exigency of the circumstances. (See *People v. Morrow* (1982), 104 Ill. App. 3d 995, 433 N.E.2d 985.) The police were aware at that point that at least two other people, defendant's mother and his girlfriend, had access to the apartment. There was the danger, therefore, that the evidence would be altered or destroyed before police could obtain a warrant. Significantly, no search was necessary to obtain the items. At most, only a seizure was made. See *People v. Free* (1983), 94 Ill. 2d 378, 447 N.E.2d 218, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 175, 104 S. Ct. 200.

■ Defendant's final argument is that he was denied a fair trial when the trial court, over defendant's objection, admitted testimony by investigating officers that defendant failed to comply with a search warrant which required him to submit to the taking of body samples, such as blood and hair samples. The testimony received indicates that after defendant's arrest on June 8, 1983, defendant was presented with a copy of a search warrant, but twice refused to submit to the sample-taking. The samples were eventually taken two days later after counsel was appointed to represent defendant.

Supreme Court Rule 413 (87 Ill. 2d R. 413) provides for judicial orders compelling the taking of body samples. Defendant concedes that his right against self-incrimination was not violated by requiring him to submit to these examinations (*Schmerber v. California* (1966), 384 U.S. 757, 16 L. Ed. 2d 908, 86 S. Ct. 1826) and does not attack the validity of the search warrant. Defendant claims, rather, that his refusal to submit to the examinations was not relevant to any issue at trial and that the prejudice to him outweighed any probative value.

The State maintains that the defendant's refusal to take the tests evidenced a consciousness of guilt as would evidence of his flight, escape, false alibi or attempt to suppress evidence. (*People v. Gambony* (1948), 402 Ill. 74, 83 N.E.2d 321; *People v. Ellis* (1966), 65 Cal. 2d 529, 421 P.2d 393, 55 Cal. Rptr. 385.) Evidence of the refusal of a defendant to submit to a field test for sobriety has been held to be evidence of the defendant's guilty conscience. (*People v. Roberts* (1983), 115 Ill. App. 3d 384, 450 N.E.2d 451; *People v. Miller* (1983), 113 Ill. App. 3d 845, 447 N.E.2d 1060.) Admission of such testimony does not violate the right of an accused against self-incrimination. *South Dakota v. Neville* (1983), 459 U.S. 553, 74 L. Ed. 2d 748, 103 S. Ct. 916.

The evidence of the defendant's noncompliance with the State's requests here has similarities both to that held to be inadmissible in

*People v. Kennedy* (1975), 33 Ill. App. 3d 857, 338 N.E.2d 414, and *People v. Warner* (1984), 121 Ill. App. 3d 322, 459 N.E.2d 1053, and that held to be admissible in *Gambony* and *Ellis*. We consider its probative value to have been greatly impaired because the warrant was served so soon after defendant's arrest and because defendant later submitted to the tests. The testimony showed that defendant qualified his refusal by indicating that he was only refusing to submit to the tests at that time. Even though defendant was required to submit to the requirements of the warrant, his refusal to do so was reasonably consistent with the response of a cautious innocent person who would want to seek the advice of counsel before submitting. The introduction of the evidence was obviously prejudicial.

Because the prejudice outweighs the slight probative value of the evidence, its admission was error. Notably, the prejudice bears more heavily upon the issue as to whether defendant was the intruder than upon the question of whether defendant intended to kill the victims. The evidence was very strong on the former issue, while a close question existed as to whether the evidence was sufficient on the latter issue. Accordingly, we hold that the error in the admission of the evidence was not reversible.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

McCULLOUGH and TRAPP, JJ., concur.