NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 180571-U

NO. 4-18-0571

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 9, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Vermilion County |
| IVORY TOWNS, | ) | No. 83CF140 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Derek J. Girton, |
| | ) | Judge Presiding. |

_____

PRESIDING JUSTICE STEIGMANN delivered the judgment of the court.
Justices Turner and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held:*    The appellate court reversed the trial court's denial of defendant's motion for additional DNA testing.

¶ 2    In September 1983, a jury found defendant, Ivory Towns, guilty of two counts of attempt (murder) (Ill. Rev. Stat. 1983, ch. 38, ¶ 8-4), two counts of home invasion (*id.* ¶ 12-11), and one count each of rape (*id.* ¶ 11-1), robbery (*id.* ¶ 18-1), and deviant sexual assault (*id.* ¶ 11-3) for the June 1983 attack of John and Jacqueline Hazel in Danville, Illinois. The trial court sentenced defendant to extended terms of 60 years' imprisonment on the attempt (murder), home invasion, rape, and deviate sexual assault convictions, and to 7 years on the robbery conviction. The sentences on the attempt (murder) convictions were ordered to run consecutively to the remaining sentences, and the remaining sentences were to run concurrently with each other.

¶ 3    In April 2018, defendant filed a *pro se* motion for deoxyribonucleic acid (DNA)

testing pursuant to section 116-3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/116-3 (West 2016)), in which he requested testing of the sexual assault kit previously collected in this case. Defendant explained that (1) DNA testing was not available in 1983, (2) DNA testing would support his claim of actual innocence, and (3) identification of the assailant was an issue at trial. In May 2018, defendant filed an amended motion elaborating on his claims and arguments. The State did not respond in any fashion. In July 2018, the trial court *sua sponte* dismissed defendant's motion, concluding defendant (1) failed to specify what evidence he wanted tested, (2) did not adequately state the facts by which identification was at issue at trial, and (3) did not establish a chain of custody for the evidence he sought tested.

¶ 4        Defendant appeals, arguing that the trial court erred by denying his request for additional DNA testing because (1) identity was the only issue at trial, (2) there was a sufficient chain of custody, and (3) the requested testing has the potential to produce new, noncumulative evidence that could materially advance defendant's claim of actual innocence. We reverse and remand for further proceedings.

¶ 5                        I. BACKGROUND

¶ 6                        A. Pretrial

¶ 7        In June 1983, defendant was charged with two counts of attempt (murder) (Ill. Rev. Stat. 1983, ch. 38, ¶ 8-4), two counts of home invasion (*id.* ¶ 12-11), and one count each of rape (*id.* ¶ 11-1), robbery (*id.* ¶ 18-1), and deviant sexual assault (*id.* ¶ 11-3) for the June 1983 attack of John and Jacqueline Hazel in Danville, Illinois.

¶ 8        In August 1983, defendant filed a "Motion to Suppress Identification Evidence" in which he argued that the line-up at which the witnesses identified defendant and the photographic identification procedure were both "not fairly conducted and deprived [d]efendant of his right to

due process of law ***." The trial court conducted a hearing on that motion later that month, at which the State and defendant each presented the testimony of three witnesses. Defendant argued that the procedures used for identification were "unnecessarily suggestive" and that this "contributed very greatly to the identification of [defendant] ***." Following argument, the court concluded that the procedure employed by the police was proper and denied the motion.

¶ 9                                    B. Trial

¶ 10          The trial court conducted defendant's jury trial in September 1983. Because the question before this court regarding defendant's trial is whether identity was at issue, we will discuss the evidence related only to that issue. We previously discussed the other evidence at length in *People v. Townes*, 130 Ill. App. 3d 844, 474 N.E.2d 1334 (1985), in which this court affirmed defendant's convictions and sentences. (We note that although that case incorrectly spelled defendant's surname as "Townes," appellate counsel has represented that defendant has confirmed the correct spelling of his surname is "Towns".)

¶ 11                          1. *Opening Statements*

¶ 12          The State's opening statement described, among other things, the lighting conditions in the apartment that allowed the victims to identify their assailant. The State said the evidence would show "there's a large Miller High Life Beer sign outside the window that shines into the apartment; that there is a fluorescent light that's kept on in their kitchen all night. That was burning; that the television set was still on." The State continued, "John Hazel heard the noise. He went out there, and he saw the defendant. I believe he'll testify in court today that that's the man he saw in his kitchen." Later, the State emphasized that when the attacker brought the victims to the bathroom, "I believe you'll see that at some point in here, one of the lights, either the bathroom or the bedroom, was turned on; that they again see the defendant clearly."

¶ 13    During defendant's opening statement, he told the jury, among other things, as follows:

> "The State has indicated that they intend to present evidence about the circumstances of an alleged identification of the Hazels' assailant, the identification that the Hazels allegedly made of [defendant]. I would ask you to remember that you are the judges of the reliability of that identification. I ask you to listen carefully to all the circumstances surrounding those identifications."

¶ 14    Defendant then described the alibi defense he would present before concluding the opening statement by saying,

> "The basic issue in this trial is not whether a crime was committed. In some trials that's one of the critical issues, was there a crime. In this case, the evidence will undoubtedly show that there was—there were some crimes committed. The Hazels were the victims. However, in this case the issue is did [defendant] commit these crimes. The evidence will show that he did not, that he was somewhere else while these crimes were being committed. The evidence will show that [defendant] is innocent of these charges."

¶ 15                                2. *The State's Evidence*

¶ 16    John and Jacqueline Hazel described their attack, which occurred at 12:30 or 12:45 a.m. on June 8, 1983. The attack was vicious and brutal, and we note that defendant at trial did not suggest that the Hazels were not attacked or that a crime was not committed. Instead, he has always maintained that he was not the assailant.

¶ 17    The Hazels testified that during the attack, they were sprayed in the eyes with a substance that burned their eyes and obscured their vision throughout large portions of the attack.

They added that during some portions of the attack, the lighting was good, and they believed they could see their attacker; at other times, they were in rooms that were dark and had little to no lighting. Both suffered head trauma during the attack, including the assailant's (1) striking John in the face and eye and (2) throwing Jacqueline down on concrete where she struck her head. Jacqueline was sexually assaulted both orally and vaginally during the attack, while John was left in a dark closet for approximately 30 to 40 minutes. John testified that when he was placed in the closet he felt "very nervous," and said he "didn't know if [he] was in shock or what." John also testified that immediately following the attack, "naturally, we were I guess, both in shock."

¶ 18          Later on June 8, 1983, the Hazels looked through hundreds of photographs and both identified a photograph of defendant as being a photograph of their assailant.

¶ 19          Still later on June 8, 1983, officers arrested defendant and took him to the police station. On the way there, defendant asked to see the warrant for his arrest, which stated that he was being charged only with one count of rape. Defendant asked if that was the only charge.

¶ 20          On June 9, 1983, the day after the attack, John identified defendant as his attacker in a physical lineup. On June 14, 1983, Jacqueline also identified defendant in a lineup as her attacker.

¶ 21          Robert Dietzen, Danville Chief of Police, testified that on June 8, 1983, at approximately 6 p.m., he went to the area of an apartment building at 107½ North Main Street in Georgetown. Other officers and witnesses testified that 107½ North Main Street is defendant's address. Dietzen was looking for keys and a wallet that belonged to John Hazel. When he was in the parking area, three or four men who had been repairing the roof at 117 North Main Street yelled to him and asked if he was looking for keys. Dietzen replied that he was, and the men gave him two keys, one which Dietzen later discovered fit a lock at John's workplace. 117 North Main Street

was approximately 75 feet away from 107½ North Main Street. The repairmen had found John Hazel's keys on the roof of 117 North Main Street. One of the men working on the roof, J.D. Kelsheimer, explained to Dietzen that the keys were not on the roof in the morning when they began working at 10:30 a.m., but "when they came back [from lunch], he said he had found the keys on the roof."

¶ 22        Dr. James Hart, an emergency physician at St. Elizabeth Hospital, testified that he examined Jacqueline around 8 a.m. to 9 a.m. on June 8, 1983. He noted bruising and swelling on her face, particularly in the area of her eyes. He said, "She was unable to really visualize me, none at all in the right eye and very little in the left eye, due to the amount of swelling." At one point they were "able to literally pry the eyelids open and determined that there was a lot of minute hemorrhaging in the eyes." She had vision in both eyes.

¶ 23        Various medical and police personnel testified as to the collection and chain of custody of specimens taken from Jacqueline and placed in a sexual assault kit.

¶ 24        Ricardo Rebollar, a forensic serologist from the Springfield Crime Laboratory, testified regarding his analysis of various specimens from the sexual assault kit. He could not come to a conclusion regarding the origin of the semen sample. He created a report that stated defendant could not be excluded as a possible source of the semen.

¶ 25                        3. *Defendant's Evidence*

¶ 26        Sammy Davis testified that he knew defendant for most of his life and was with defendant on the evening of June 7, 1983. Defendant picked him up, and they drove around town. They "got a little wine, drinking that; went to Harold's Tavern, played poker machines. And after that, [they] just rode around again, went to the park." Defendant took Davis home at approximately 11:45 p.m. or 11:50 p.m., "because [defendant] was going to pick up his girlfriend at work."

¶ 27        Ernest Paige, the brother of defendant's girlfriend at the time (Debra Nelson), testified that he saw defendant at a gas station in Georgetown around 10 or 10:30 p.m. on the evening of June 7, 1983. Paige and defendant rode around until approximately midnight. Paige stated that they were heading to pick up Nelson from work when defendant's car died. A person in a red truck stopped to help them, and a police officer pulled up behind them. They were able to get defendant's car started again and picked up Nelson. Defendant and Nelson dropped Paige off at his home between 12:30 a.m. and 12:45 a.m. on June 8, 1983.

¶ 28        Robert Galladay testified that shortly before midnight on June 7, 1983, he stopped to help a stranded motorist. He recognized the motorist as defendant, who was a regular customer at the gas station Galladay ran.

¶ 29        Debra Nelson, defendant's girlfriend at the time, testified that she worked until midnight on the morning of June 8, 1983. Defendant came and picked her up when she got off work. She took over driving defendant's car, and they dropped her brother, Paige, off at home. Defendant and Nelson rode around Danville until 1:45 a.m. before returning to Georgetown. Defendant fell asleep while she drove. When they got back to Georgetown, they went to bed. Defendant was with Nelson the entire morning after she finished work.

¶ 30        Nelson testified that she and defendant awoke around 9 a.m. on June 8, 1983, and went to Danville before proceeding to defendant's mother's house in Georgetown around 1 p.m. Both of defendant's parents testified that defendant and Nelson were at their house around 12:30 that afternoon. Defendant and Nelson left his parents' house before 1:30 p.m. and went back to their apartment so Nelson could get ready for work. Defendant took Nelson to work at 2:30 p.m.

¶ 31                                4. *Closing Arguments*

¶ 32        The State argued, "Clearly, there's only one thing really disputed in this trial. ***

The question here is, 'Who did it?' The identification of [defendant], that's what you've got to decide." Defendant argued that the identifications were not reliable.

¶ 33 The jury found defendant guilty of all charges, and the trial court sentenced defendant as earlier stated.

¶ 34 C. Defendant's Motion for DNA Testing

¶ 35 In April 2018, defendant *pro se* filed a motion for DNA testing pursuant to section 116-3 of the Code (725 ILCS 5/116-3 (West 2016)), in which he requested testing of the sexual assault kit previously collected in this case. Defendant explained that (1) DNA testing was not available in 1983, (2) DNA testing would support his claim of actual innocence, and (3) identification of the assailant was an issue in this case. In May 2018, defendant filed an amended motion, elaborating on his claims and arguments. The State did not respond in any fashion. In July 2018, the trial court *sua sponte* dismissed defendant's motion, concluding defendant (1) failed to specify what evidence he wanted tested, (2) did not adequately state the facts by which identification was at issue at trial, and (3) did not establish a chain of custody for the evidence he sought tested.

¶ 36 This appeal followed.

¶ 37 II. ANALYSIS

¶ 38 Defendant appeals, arguing that the trial court erred by denying his request for additional DNA testing because (1) identity was the only issue at trial, (2) there was a sufficient chain of custody, and (3) the requested testing has the potential to produce new noncumulative evidence that could materially advance defendant's claim of actual innocence. We reverse and

remand for further proceedings.

¶ 39                               A. The Law

¶ 40        Section 116-3 of the Code does not provide a general means to discover evidence. *People v. Barrow*, 2011 IL App (3d) 100086, ¶ 30, 954 N.E.2d 895. To require testing, a defendant must show that the testing has the scientific potential to produce new, noncumulative evidence that is materially relevant, though not necessarily exonerating, to defendant's claim of actual innocence. *People v. Savory*, 197 Ill. 2d 203, 213, 756 N.E.2d 804, 810 (2001); *People v. English*, 2013 IL App (4th) 120044, ¶ 21, 987 N.E.2d 1058. Evidence is considered materially relevant if it tends to significantly advance the claim of actual innocence. *People v. Snow*, 2012 IL App (4th) 110415, ¶ 65, 964 N.E.2d 1139. A defendant must also present a *prima facie* case that (1) "identity was the issue in the trial" and (2) "the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect." 725 ILCS 5/116-3(b) (West 2016). An appellate court reviews *de novo* a trial court's denial of a motion for testing pursuant to section 116-3. *People v. Gawlak*, 2019 IL 123182, ¶ 25, 131 N.E.3d 477.

¶ 41                              B. This Case

¶ 42                    1. *Identity Was an Issue at Trial*

¶ 43        Defendant contends that identity was at issue at trial, and we agree. At trial, both the State and defendant acknowledged that a crime had been committed and that the only issue was whether the attacker was in fact defendant. The trial court's belief that defendant "does not adequately state the facts by which identification was at issue at trial" is wholly contradicted by the record. We note that in defendant's *pro se* motion for DNA testing, he states that identification was at issue because (1) the attacker "sprayed something that burn[ed] into [the Hazels] eyes,"

(2) medical treatment was rendered hours after the attack, (3) a "rape kit" was used to collect evidence from Jacqueline Hazel, and (4) the Hazels expressed some uncertainty during the lineup.

¶ 44     The State argues that the evidence at trial was overwhelming, including the evidence of identification. However, for purposes of section 116-3 of the Code, the supposed strength of the identification evidence at trial is irrelevant.

¶ 45                                    2. *Chain of Custody*

¶ 46     Defendant requested testing on Peoples Exhibit 16, the vaginal swab and smear, which were collected as part of the sexual assault kit and admitted into evidence at trial. As the Illinois Supreme Court has stated, a piece of evidence can be considered to have been "subject to a sufficiently secure chain of custody," if it is "a piece of real evidence admitted at trial, [which] would have remained in the custody of the circuit court clerk after the defendant's conviction." *People v. Johnson*, 205 Ill. 2d 381, 394, 793 N.E.2d 591, 600 (2002). The Illinois Supreme Court reiterated its position one year later, stating, "We concluded that defendant made a *prima facie* case for DNA testing under section 116-3 because he established that identity was a central issue at trial and that there had been a secure chain of custody for the Vitullo rape kit. Because the Vitullo kit was entered into evidence, it would remain in the possession of the circuit court clerk after defendant's conviction." *People v. Shum*, 207 Ill. 2d 47, 65, 797 N.E.2d 609, 620 (2003).

¶ 47     We conclude that, similar to *Johnson*, the record demonstrates a sufficiently secure chain of custody at trial because the sexual assault kit itself was introduced into evidence at trial. We acknowledge that (1) 37 years have passed since defendant's trial and (2) the record before us contains no current information about the sexual assault kit that defendant seeks to have examined. Accordingly, on remand a record will need to be made regarding whether (1) that kit can be located for testing, (2) a proper chain of custody has been maintained since its use at defendant's trial, and

(3) it is still capable of being scientifically tested as defendant requests.

¶ 48          3. *DNA Testing Could Potentially Produce New, Noncumulative Evidence*

*Materially Relevant to Defendant's Claim of Actual Innocence*

¶ 49          Defendant argues that DNA testing should be allowed because (1) the testing requested employs a scientific method generally accepted within the relevant scientific community and (2) the result of that testing has the potential to provide new, noncumulative evidence materially relevant to defendant's claim of actual innocence, as required by section 116-3(c) of the Code (725 ILCS 5/116-3(c) (West 2016)). Because the State does not argue to the contrary, we accept the State's tacit admission that (1) the testing method is generally accepted and (2) the test has the potential to provide new, noncumulative evidence materially relevant to defendant's claim of actual innocence. Therefore, we conclude that defendant is entitled to have that sexual assault kit tested.

¶ 50          In coming to that conclusion, we express no opinion regarding what should happen if, for whatever reason, the evidence is unusable or the test cannot be performed. We also express no opinion regarding defendant's guilt or innocence. Our conclusion is limited as follows: assuming a DNA test can be done on the vaginal swab and smear contained in the sexual assault kit, defendant is entitled to that test.

¶ 51                                III. CONCLUSION

¶ 52          For the reasons stated, we reverse the trial court's judgment and remand for further proceedings consistent with this order.

¶ 53          Reversed and remanded.