53 P.3d 520 (2002)
113 Wash.App. 171
STATE of Washington, Respondent,
v.
Frank Reed NORDLUND, Appellant.
No. 26222-3-II.
Court of Appeals of Washington, Division 2.
August 30, 2002.
*522 Linda J. King, Attorney At Law, Steilacoom, WA, for Appellant.
Barbara L. Corey-Boulet, Pierce Co. Deputy Pros. Atty, Tacoma, WA, for Respondent.

*521 PART PUBLISHED OPINION
SEINFELD, P.J.
Frank Reed Nordlund appeals multiple convictions arising out of attacks against two young women. Holding that an affiant's general statements about the habits of sex offenders are insufficient to support the issuance of a search warrant for a personal computer but concluding that the admission of the evidence from the search in this case was harmless as to the counts involving one of the victims, we affirm in part and reverse in part. Further holding that reliance on an anticipatory crime to support application of the Persistent Offender Accountability Act did not violate ex post facto protections, we affirm Nordlund's sentence.

FACTS
A jury found Nordlund guilty of indecent liberties by forcible compulsion, count I; two counts of unlawful imprisonment, counts II and IV; and second degree attempted rape, count III. The crimes involved two separate attacks against two separate victims on the same day.
Counts III and IV arose out of a July 2, 1999, attack against 13-year-old D.T. D.T. was pushing her 2-year-old sister in a stroller around 11:25 a.m. when she noticed a man walking behind her. As she struggled to get out of the man's way, he put his arm around her neck and a hand over her mouth.
The man told D.T. to be quiet but she screamed. He then hit her in the mouth, lifted her and the stroller over the fence of a nearby home, dragged her behind some bushes, and told her to take off her shoes, pants and underwear. When D.T. refused, the man removed the garments.
The homeowner, Wallace Black, heard noises and came outside. D.T.'s attacker told him: "`This is my girlfriend. We're having a fight.'" 3 Report of Proceedings (RP) at 205. The man then ran away. Black later described the attacker as wearing dark nylon sweat pants and a reddish, maroon ski mask with holes for the eyes and mouth.
D.T. told the police that her attacker had pulled a green ski mask out of his pocket or from the side of his pants when he first pinned her down. She said that the mask had holes for the eyes and mouth and that the man wore a pair of big, rounded, dark-rimmed glasses over the mask's eyeholes. D.T. also observed that her attacker was wearing green cloth sweat pants, dirty white sneakers, and a gray-sleeved sweatshirt with raised lettering. Although D.T. was unable to identify Nordlund as her attacker, she was able to identify the glasses her attacker was wearing in photographs of items that the police took from Nordlund's home.
Counts I and II arose out of an attack against 16-year-old R.P. that occurred at about 8 p.m. on July 2. R.P. was walking with her nieces and nephew when a man walked up to her and forcefully grabbed her breasts. R.P. struggled but the man grabbed her *523 wrist and pushed her backwards. Eventually, the man started laughing, let R.P. go, and walked away down a nearby alley.
R.P. described her attacker as a white male, medium to heavy build, with short dark hair and a "5:00 shadow." 4 RP at 327. He was wearing a reddish brown knit cap rolled up to the top of his ears, a navy blue or purple shirt with a sports logo on it, green nylon warm-up pants, black and white tennis shoes, and glasses with thick black rims. R.P. first identified Nordlund as her attacker at a "show-up" on the night of the attack, again in a photo montage several days later, and again at trial. 5 RP at 526.
At about 9:30 p.m. on July 2, police officer John Otis observed Nordlund in an alley. When Nordlund saw the police car, he went behind a garage. Otis then turned into a dirt Laundromat parking lot and saw Nordlund walking toward the Laundromat doors. Nordlund was wearing green nylon warm-up pants, a purplish T-shirt with a logo or writing on the front, and holding a pair of large-framed glasses in his hand.
Otis contacted Nordlund and asked if he lived in the area. Nordlund responded that he was visiting a friend but he could not provide the friend's address. He first said that he had been riding around with a friend but he later told Otis that he had been at his brother's house.
An officer brought R.P. to the Laundromat to view Nordlund; she immediately identified him as her attacker. Police then found a reddish ski mask in the parking lot near the Laundromat door. The mask looked like it had just been dropped because it was not dirty and had not been run over. At trial, the State's forensic expert opined that Nordlund was "possibly" the source of two of the hairs found on the mask. 8 RP at 676.
The police arrested Nordlund but he was released on bail on July 3. On July 6, the State charged him with the four counts involved in this appeal and that same day Nordlund prepared a "Statement of Day" document on his personal computer, which described his whereabouts on July 2, from noon until his arrest sometime after 9:30 p.m.
On July 10, the police executed a King County search warrant at Nordlund's home and seized, among other items, his personal computer. Pursuant to a later Pierce County search warrant, the police searched Nordlund's computer and discovered the "Statement of Day" document.
Following trial, the jury convicted Nordlund as charged. The trial court then sentenced him as a persistent offender to life imprisonment without the possibility of parole.

DISCUSSION

I. MOTION TO SUPPRESSSEARCH WARRANTS
Nordlund challenges two search warrants: (1) the King County warrant authorizing the search of his residence and the seizure of any computer equipment; and (2) the later Pierce County warrant authorizing the search of the computer seized pursuant to the King County warrant. Nordlund argued below that the affiant failed to establish the reliability of anonymous informants referenced in one of the affidavits, and that the affidavit did not show that the computer was an instrumentality of the alleged crimes or that it would contain evidence of those crimes.
On appeal, Nordlund presents a constitutional claim of ineffective assistance of counsel. To support this claim, he alleges trial counsel's failure to raise two additional challenges at the suppression hearing: (1) that the warrants were insufficiently particular; and (2) that the Pierce County warrant was invalid because the affidavit supporting it was unsigned. To establish ineffective assistance, Nordlund must show deficient performance and actual prejudice, i.e., that a motion to suppress would likely have been granted. State v. McFarland, 127 Wash.2d 322, 333-35, 899 P.2d 1251 (1995).
The fourth amendment[1] requires that an affidavit supporting a warrant establish *524 probable cause, i.e., it must contain "facts and circumstances sufficient to establish a reasonable inference that the defendant is probably involved in criminal activity and that evidence of the crime can be found at the place to be searched." State v. Thein, 138 Wash.2d 133, 140, 977 P.2d 582 (1999); State v. Cole, 128 Wash.2d 262, 286, 906 P.2d 925 (1995). The fourth amendment also contains a particularity requirement that prevents general searches and "the issuance of warrants on loose, vague, or doubtful bases of fact." State v. Perrone, 119 Wash.2d 538, 545, 834 P.2d 611 (1992). We review a challenge to a search warrant for an abuse of discretion. Cole, 128 Wash.2d at 286, 906 P.2d 925.
A. THE PARTICULARITY REQUIREMENT
To satisfy the particularity requirement, the warrant must be sufficiently definite to allow the searching officer to identify the objects sought with reasonable certainty. State v. Stenson, 132 Wash.2d 668, 691-92, 940 P.2d 1239 (1997); Perrone, 119 Wash.2d at 546, 834 P.2d 611. The degree of required specificity turns on the circumstances and the type of items involved. Stenson, 132 Wash.2d at 692, 940 P.2d 1239; Perrone, 119 Wash.2d at 546, 834 P.2d 611. "A description is valid if it is as specific as the circumstances and the nature of the activity, or crime, under investigation permits." Stenson, 132 Wash.2d at 692, 940 P.2d 1239. We review de novo whether a search warrant meets the particularity requirement but we interpret warrants "in a commonsense, practical manner, rather than in a hypertechnical sense." Perrone, 119 Wash.2d at 549, 834 P.2d 611.
The King County search warrant lists numerous very specifically described items, and the accounts in the supporting affidavits support those descriptions. Nordlund challenges the seizure of a photo album but the warrant authorizes the seizure of photos of another alleged victim, A.J., and the supporting affidavit explains that A.J.'s attacker took her purse, which contained photos of A.J. and her family. Thus, Nordlund has not demonstrated that a motion to suppress on particularity grounds probably would have been successful. Consequently, he has not shown ineffective assistance on this basis. See McFarland, 127 Wash.2d at 337 n. 4, 899 P.2d 1251.
B. THE SIGNED AFFIDAVIT OR SWORN TESTIMONY REQUIREMENT
Nordlund also challenges the Pierce County search warrant as being unsupported by a signed affidavit. A search warrant must be supported by either a signed affidavit that meets the requirements of RCW 9A.72.085 or by sworn testimony. CrR 2.3(c). Here, although the Pierce County affidavit is unsigned, the magistrate signed the affidavit as being "[a]cknowledged and sworn to before me this 14 day of July, 1999." Clerk's Papers (CP) at 372. Thus, Nordlund has not shown that the Pierce County warrant was defective and that a motion to suppress on this ground probably would have been successful. See McFarland, 127 Wash.2d at 337 n. 4, 899 P.2d 1251. Consequently, his ineffective assistance claim regarding the affidavit fails.
C. RELIABILITY OF INFORMANTS
Nordlund argues that the State failed to establish the credibility and reliability of the informants who provided information about his computer use. These informants, identified as Nordlund's friends and co-workers, told police that they had seen an operable computer at Nordlund's residence and they described Nordlund as an "active user of this computer" and a frequent E-mail communicator with one of the informants. CP at 364.
The magistrate could have reasonably inferred that this noncriminal and nonaccusatory information from Nordlund's friends and co-workers was based on personal knowledge. Thus, the State did not need to demonstrate the credibility and reliability of these citizen informants. See State v. Stone, 56 Wash.App. 153, 156, 782 P.2d 1093 (1989) (no demonstration of credibility and reliability required where unidentified citizen provides nonaccusatory information, does not describe criminal activity, "and the nature of *525 the information strongly suggests he is relating personal observation") (citing United States v. Melvin, 596 F.2d 492 (1st Cir.1979)).
D. NEXUS BETWEEN THE COMPUTER AND EVIDENCE OF A CRIME
Finally, Nordlund argues that the affidavits supporting the search warrants contain only generalized statements about the habits of sex offenders and that these are insufficient to support the seizure and search of his personal computer. We agree.
The trial court aptly described a personal computer as "`the modern day repository of a man's records, reflections, and conversations.'" CP at 200. Thus, the search of that computer has first amendment implications that may collide with fourth amendment concerns. When this occurs, we closely scrutinize compliance with the particularity and probable cause requirements. Zurcher v. Stanford Daily, 436 U.S. 547, 564, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978); Stanford v. Texas, 379 U.S. 476, 485, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965); Perrone, 119 Wash.2d at 547, 834 P.2d 611 ("Where a search warrant authorizing a search for materials protected by the First Amendment is concerned, the degree of particularity demanded is greater[.]"). See also Stenson, 132 Wash.2d at 692, 940 P.2d 1239 (search warrants for documents are generally given closer scrutiny because of potential for intrusion into personal privacy).
Under this "scrupulous" scrutiny, the King and Pierce County affidavits do not demonstrate probable cause for the seizure and search of Nordlund's personal computer. Stanford, 379 U.S. at 485, 85 S.Ct. 506. The affidavits supporting the King County warrant describe Nordlund's noncriminal computer use and conclude that the "computer or similar electronic storage device will provide data that will assist in establishing dates and times in which [Nordlund] was at his residence which given the number of assaults and the locations, this will provide necessary information that may serve to establish [Nordlund's] location at critical times relevant to the alleged crimes." CP at 364. See also CP at 360 ("As stated in [the] attached affidavit [Nordlund] used a computer at this residence to access pornography and communicate with others via E-mail. Therefore, the computer and any electronic storage media could likely provide important evidence in this case regarding intent, dates and locations.").
Although the affidavits establish the presence of a computer in Nordlund's home and his noncriminal use of that computer, they do not contain particularized information demonstrating the required nexus between the computer and the possible evidence of the crimes under investigation. See United States v. Kow, 58 F.3d 423, 427-28 (9th Cir. 1995) (rejecting search warrant on particularity and overbreadth grounds as warrant failed, in part, to specify alleged crime to which the seized documents related). "`[P]robable cause requires a nexus between criminal activity and the item to be seized[.]'" Thein, 138 Wash.2d at 140, 977 P.2d 582 (quoting State v. Goble, 88 Wash. App. 503, 509, 945 P.2d 263 (1997)).
The affidavits supporting the King County warrant contain no factual support for the conclusory statement that the computer contained data that would establish Nordlund's "location at critical times relevant to the alleged crimes." CP at 364. Although an examination of the computer could show the times that Nordlund was using his computer and, thus, support an inference that he was home at those times, there is no factual nexus between this information and any alleged criminal activity. See Thein, 138 Wash.2d at 140, 977 P.2d 582. At most, this information could establish that Nordlund did not commit the charged crimes.
Nor is there a nexus between the alleged crimes and Nordlund's use of the computer to access pornography and send E-mails. Rather, it appears that the State was fishing for some incriminating document, which is precisely what the first and fourth amendments prohibit. See Zurcher, 436 U.S. at 564, 98 S.Ct. 1970 ("Where presumptively protected materials are sought to be seized, the warrant requirement should be administered to leave as little as possible to the discretion or whim of the officer in the field."); Stanford, 379 U.S. at 481-86, 85 *526 S.Ct. 506 (summarizing the roots of the fourth amendment and the interaction of first amendment concerns).
As the affidavit supporting the Pierce County warrant incorporates and relies upon the affidavits supporting the King County warrant, the Pierce County warrant fails in regard to the computer, along with the King County warrant. Nor is the Pierce County warrant salvageable by the affidavit's generalized statements about the habits of sex offenders such as: in the affiant's "experience and training[,] sex offenders often keep notes, newspaper clippings, diaries and other memorabilia of their crimes," and that such items had been found on suspects' computers in other sexual assault cases. CP at 369. These general statements, alone, are insufficient to establish probable cause. See, e.g., Thein, 138 Wash.2d at 147-50, 977 P.2d 582 (general statements about the common habits of drug dealers were insufficient to establish a specific factual nexus that evidence of illegal activity was likely to be found at place to be searched). Thus, the State has failed to demonstrate the existence of probable cause to seize and search Nordlund's personal computer.
Although the trial court erred in admitting evidence derived from the search of Nordlund's computer, the only evidence admitted from this source was testimony that there had been computer activity on July 2, 4, and 6, and Nordlund's "Statement of Day" document. As this error was of constitutional magnitude, it was not harmless unless the record shows beyond a reasonable doubt that it did not contribute to the jury verdict. Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).
The evidence regarding computer activity on July 2, 4, and 6 is undoubtedly harmless as that was the extent of the testimony and the State elicited no more specific information. Nor does Nordlund contend on appeal that this evidence was harmful.
The "Statement of Day" document[2] is more problematic. The State used it to impeach the credibility of Nordlund and his alibi witnesses by highlighting inconsistencies between the times set forth in the document and the times testified to by defense witnesses. The State sought to portray Nordlund as carefully crafting his alibi as he learned more about the attacks under investigation.
For instance, the "Statement of Day" document indicates that Nordlund's nephew, sister, and sister's boyfriend arrived at Nordlund's house at about noon on July 2. But according to trial testimony, Nordlund's *527 nephew had stayed the night at Nordlund's house on July 1. Defense witnesses also testified that the sister and her boyfriend arrived sometime between 11 and noon on July 2.
The major inconsistency highlighted by the State involved the timing of a note Nordlund purportedly left at his brother's house the night of July 2. Nordlund wrote in the "Statement of Day" document that he left the note at about 7:40 p.m. but the time on the note admitted at trial was 8:40 p.m. In closing, the State suggested that Nordlund had planted the note at his brother's house after the attacks and that the discrepancy in the timing on the note resulted from Nordlund's efforts to create an alibi.
According to the State, after Nordlund typed 7:40 p.m. on the "Statement of Day" document, "he learned that he was arrested at 9:30. And extrapolating back ... he realized, well, 7:40 doesn't work." 15 RP at 1662-63. Thus, the State contended that Nordlund wrote a note stating 8:40 p.m. and then planted it at his brother's house.
Given the overwhelming eye-witness identification and corroborating details in the case involving R.P., this evidence was harmless. R.P. had the opportunity to view her unmasked attacker for an extended period of time, she provided a detailed description of her attacker that closely matched Nordlund as he appeared when police stopped him later that night, and she identified Nordlund as her attacker on three separate occasions. We are satisfied beyond a reasonable doubt that the admission of the "Statement of Day" document did not contribute to the verdict on counts I and II. See Chapman, 386 U.S. at 24, 87 S.Ct. 824.
But we cannot conclude beyond a reasonable doubt that the State's use of the "Statement of Day" document to impeach Nordlund, his alibi defense, and his witnesses did not contribute to the verdicts on counts III and IV involving D.T. See Chapman, 386 U.S. at 24, 87 S.Ct. 824. D.T. could not identify Nordlund as her attacker because the man was wearing a mask and because she intentionally tried not to look at him. And although D.T.'s description of her attacker had a number of similarities to R.P.'s description, it was R.P.'s description that most closely matched Nordlund when police stopped him the night of the attacks.
The "Statement of Day" document did not include any information about Nordlund's activities at the time of the attack on D.T. and, thus, did not substantively impact his alibi. But as the case involving D.T. turned on circumstantial evidence, the credibility of Nordlund and his witnesses was a key issue. Consequently, although the evidence was sufficient to support the verdicts on counts III and IV, the erroneous admission of the "Statement of Day" evidence was not harmless as to these counts.
Therefore, we affirm Nordlund's convictions on counts I and II involving R.P. but reverse his convictions on counts III and IV involving D.T.

II. BODY HAIR SAMPLINGCONSCIOUSNESS OF GUILT
The defense objected to the order allowing the taking of "hair samples" from Nordlund to compare with hairs taken from the ski mask found at the Laundromat. CP at 26. And when the State attempted to execute the order, Nordlund refused to allow the taking of body hair samples. The trial court then allowed the State to elicit testimony of this refusal as evidence of a consciousness of guilt.
Nordlund now argues that evidence of this refusal was inadmissible and irrelevant as the court's order did not authorize body hair sampling. See CrR 4.7(b)(2)(vi).[3] He asserts *528 that this evidentiary error was prejudicial because the State used his refusal during closing argument to infer guilt and, further, that this evidence was an improper comment on his constitutional right to be free from unreasonable search and seizures.
Nordlund's claim of error rests on the premise that the trial court's order did not authorize body hair sampling. But Nordlund misinterprets the court's order. The State moved to take "cuttings and pluckings of head, pubic, and body hair," which the defense acknowledged, CP at 23, and the trial court then granted the State's motion, allowing it to obtain "hair samples" from Nordlund. CP at 26. Within this context, it is clear that the trial court's reference to "hair samples" was to head, pubic and body hair.
Further, the trial court's admission of Nordlund's refusal to submit to the body hair sampling as evidence of a consciousness of guilt is consistent with authority allowing similar evidence. See, e.g., State v. Clark, 143 Wash.2d 731, 765, 24 P.3d 1006, cert. denied, ___ U.S. ___, 122 S.Ct. 475, 151 L.Ed.2d 389 (2001) (false information); State v. Cartwright, 76 Wash.2d 259, 264, 456 P.2d 340 (1969) (use of aliases); State v. Bruton, 66 Wash.2d 111, 112, 401 P.2d 340 (1965) (flight); State v. Sanders, 66 Wash.App. 878, 885-86, 833 P.2d 452 (1992) (witness tampering); State v. Allen, 57 Wash.App. 134, 143, 787 P.2d 566 (1990) (providing false name and false birth certificate). Such evidence is admissible if it suggests a reasonable inference of a consciousness of guilt as to the charged crime. State v. Freeburg, 105 Wash. App. 492, 497-98, 20 P.3d 984 (2001).
Moreover, although we find no Washington case specifically addressing whether a refusal to provide a court-ordered hair sample is admissible as consciousness of guilt evidence, other jurisdictions have addressed this issue. Generally, the evidence is proper if there was a reasonable inference of such a consciousness as to the charged crime.
As the Ninth Circuit noted in discussing a defendant's concealment of evidence by engaging in behavior such as witness tampering, and by refusing to provide properly requested evidence, "[a]n attempt by a criminal defendant to suppress evidence is probative of consciousness of guilt and admissible on that basis." United States v. Castillo, 615 P.2d 878, 885 (9th Cir.1980).[4]See also United States v. Parhms, 424 F.2d 152, 154-55 (9th Cir.1970) (evidence of defendant's refusal to participate in pre-trial line-up admissible and prosecutor did not err in commenting upon that refusal); Wilson v. State, 596 So.2d 775, 777-78 (Fla.Dist.Ct.App.1992) (refusal to provide handwriting sample has significant probative value); State v. Haze, 218 Kan. 60, 542 P.2d 720, 722-24 (Kan.1975) (refusal to give handwriting sample provided basis for inference of consciousness of guilt); Marshall v. State, 85 Md.App. 320, 583 A.2d 1109, 1111 (1991) (evidence that defendant charged with first degree rape shaved his pubic hair while in jail admissible as evidence of consciousness of guilt); Commonwealth v. Brown, 24 Mass.App.Ct. 979, 513 N.E.2d 693, 695-96 (Mass.App.Ct.1987) ("Evidence that a defendant has refused to comply with a court order is admissible so long as that order does not require the production of testimonial evidence.") (citations omitted). But see People v. Townes, 130 Ill.App.3d 844, 86 Ill.Dec. 137, 474 N.E.2d 1334, 1344 (1985) (error to admit evidence of defendant's refusal to submit to taking of body specimens as refusal had limited probative value because defendant only refused to provide samples at that time).
Here, it is reasonable to infer a consciousness of guilt from Nordlund's refusal to allow body hair sampling. And there was a valid court order directing the taking of hair samples. There were several different types of hair on the ski mask Nordlund allegedly kept in his waist band, and he was charged with sexual assault crimes. Thus, the trial court did not abuse its discretion in allowing this evidence and the State did not commit prosecutorial misconduct by referring to that evidence *529 in closing argument.[5]See State v. Wade, 138 Wash.2d 460, 463-64, 979 P.2d 850 (1999) (appellate court reviews trial court's evidentiary decisions for abuse of discretion); State v. Smith, 104 Wash.2d 497, 510, 707 P.2d 1306 (1985) (defendant alleging prosecutorial misconduct must establish impropriety of prosecutor's actions and prejudice resulting therefrom).

III. PERSISTENT OFFENDER ACCOUNTABILITY ACT
Nordlund challenges his life sentence, contending that the trial court erred in using his 1985 second degree attempted rape convictions to find that he was a persistent offender under the Persistent Offender Accountability Act (POAA).
Nordlund was sentenced on his current convictions in June 2000. At that time, the POAA defined "persistent offender," in relevant part, as an offender who:
(b)(i) Has been convicted of: (A) Rape in the first degree, rape of a child in the first degree, child molestation in the first degree, rape in the second degree, rape of a child in the second degree, or indecent liberties by forcible compulsion; ... or (C) an attempt to commit any crime listed in this subsection (29)(b)(i); and
(ii) Has, before the commission of the offense under (b)(i) of this subsection, been convicted as an offender on at least one occasion, whether in this state or elsewhere, of an offense listed in (b)(i) of this subsection.
Former RCW 9.94A.030(29) (2000).[6] Additionally, the Sentencing Reform Act of 1981(SRA) directed that in calculating a defendant's offender score, the court should score prior felony anticipatory offenses the same as convictions for the completed offense. Former RCW 9.94A.360(4) (2000);[7] former RCW 9.94A.410 (2000).
Because of "confusion over whether anticipatory crimes were included in the definition of `serious violent offense,' whether they were eligible for a deadly weapon enhancement, and how they should be counted in the offender score," the legislature adopted clarifying amendments in 1986. State v. Jackson, 61 Wash.App. 86, 91, 809 P.2d 221 (1991). These amendments directed the court to treat anticipatory offenses the same as the completed offenses. Jackson, 61 Wash.App. at 91, 809 P.2d 221. See also LAWS OF 1986, ch. 257, §§ 17, 22-25, 29. Those 1986 amendments had an effective date of July 1, 1986. LAWS OF 1986, ch. 257, § 38.
Here, Nordlund's 1985 convictions involved crimes committed before the clarifying 1986 amendments and before the 1993 passage of the POAA. See LAWS OF 1994, vol.1, ch. 1 at 17. He argues that the legislature, by specifying an effective date of July 1, 1986, expressed a clear intent that the 1986 amendments should be applied prospectively only. Similarly, he contends that if there is any ambiguity as to how to treat his attempted rape convictions, that ambiguity should be resolved in his favor under the rule of lenity. But as we find no ambiguity in the application of the SRA and the POAA to Nordlund's 1985 attempted rape convictions, he is not entitled to the benefit of the rule of lenity.
Nordlund acknowledges that the 1986 amendments were intended, in part, to clarify the intended treatment of anticipatory offenses under the SRA. See Jackson, 61 Wash.App. at 91, 809 P.2d 221. We will apply curative amendments that "clarif[y] or technically correct[] an ambiguous statute" retroactively. In re F.D. Processing, Inc., *530 119 Wash.2d 452, 461, 832 P.2d 1303 (1992). See also State v. Cruz, 139 Wash.2d 186, 191-92, 985 P.2d 384 (1999). Thus, Nordlund's prospective only argument is unpersuasive.
This case differs from Cruz where the defendant's previously "washed-out" conviction was subsequently revived by a later amendment that exempted sex offenses from the SRA wash-out provisions. 139 Wash.2d at 188, 190-93, 985 P.2d 384. That amendment could not be characterized as curative as it substantially changed the meaning of "criminal history" by eliminating the wash-out provisions. See State v. Smith, 144 Wash.2d 665, 674, 30 P.3d 1245 (2001), 39 P.3d 294 (2001); Cruz, 139 Wash.2d at 192-93, 985 P.2d 384.
Nordlund also argues that using his 1985 attempted rape convictions to find that he is now a second strike persistent offender violates ex post facto protections. Specifically, he argues that this use aggravates the crime of second degree attempted rape and increases the punishment for that crime.
The ex post facto clauses of the United States Constitution, art. I, § 10, and the Washington Constitution, art. I, § 23, prohibit the State
from enacting any law that (1) punishes an act that was not punishable at the time the act was committed, (2) aggravates a crime or makes the crime greater than it was when committed, (3) increases the punishment for an act after the act was committed, and (4) changes the rules of evidence to receive less or different testimony than required at the time the act was committed in order to convict the offender.
State v. Angehrn, 90 Wash.App. 339, 343, 952 P.2d 195 (1998) (citing Collins v. Youngblood, 497 U.S. 37, 42, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990); State v. Ward, 123 Wash.2d 488, 496, 869 P.2d 1062 (1994)). See also In re Personal Restraint of Williams, 111 Wash.2d 353, 362-63, 759 P.2d 436 (1988).
Washington courts have previously rejected similar ex post facto arguments regarding the use of prior convictions in applying the SRA and the POAA. For instance, the Washington Supreme Court rejected a defendant's claim that the use of his pre-SRA convictions to calculate his sentence for his post-SRA conviction violated the ex post facto clauses. In re Williams, 111 Wash.2d at 363, 759 P.2d 436. "[T]he SRA does not increase punishment for the defendant's prior offenses; rather, it calculates his sentence for his post-SRA conviction only. Use of the SRA in such a manner does not violate the ex post facto provisions[.]" In re Williams, 111 Wash.2d at 363, 759 P.2d 436. See also State v. Randle, 47 Wash.App. 232, 240-43, 734 P.2d 51 (1987) (applying same analysis with same result).
Similarly, Division I of this court has rejected the claim that the POAA retroactively increases punishment for the previously committed first two strikes. Angehrn, 90 Wash. App. at 343-44, 952 P.2d 195. The Angehrn court concluded that the POAA's mandatory life sentence is triggered by defendant's current third conviction; as defendant committed the third "strike" well after the passage of the POAA, he had fair notice of the life sentence if he committed that third offense. 90 Wn.App. at 343-44, 952 P.2d 195. The court concluded "that POAA does not constitute ex post facto punishment when applied to cases where the act constituting the third strike occurs after POAA's enactment." Angehrn, 90 Wash.App. at 344, 952 P.2d 195.
Here, Nordlund committed the current convictions well after the 1993 passage of the POAA. Thus, he had "fair warning of conduct which will result in criminal penalties and of the punishment the State may impose[.]" State v. Schmidt, 143 Wash.2d 658, 673, 23 P.3d 462 (2001). As with the use of his other prior convictions to calculate his offender score under the SRA, the use of these convictions to determine the POAA's application does not increase the punishment for his prior strikes; rather, the prior strikes are used only to calculate his current sentence for his post-POAA convictions. See In re Williams, 111 Wash.2d at 363, 759 P.2d 436. Consequently, there is no ex post facto violation.
We affirm counts I and II but reverse and remand counts III and IV.
A majority of the panel having determined that only the foregoing portion of this opinion *531 will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.
We concur: HOUGHTON, J. and BRIDGEWATER, J.
NOTES
[1] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV.
[2] The document provided in part:

On 7/2/99 around 12:00PM my sister, her boyfriend, and their son came by my house. They wanted to know if I could help them with the installation of a fan belt on their camero [sic]. After I took a shower and got ready we all drove down to Shuck's Auto Supply on 152nd and Pacific Ave. where I purchased a fan belt for them. (See attached Copy of Receipt indicating item purchased, date of 7/2/99, and time (14:07:58) (2:07 pm) we were at Shuck's Auto supply). After purchasing the fan belt we all proceeded to my sisters house where we used my tools to install the fan belt. While putting the fan belt in I bumped my forehead on the hood of the car which left a little knot and mark. They asked for my help with the fan belt because my sister's boyfriend was in a serious car accident and is currently in no position to be working on cars. Otherwise, he would be capable of doing the job himself. I estimate we were completely done with the fan belt in about one hour and forty-five minutes.
[Describing activities from approximately 4:50 p.m. until about 7:15 p.m.].
After dropping the [video] games off my sister wanted to know if I could install windows 98 on their computer. I indicated I could but that my brother Byron Nordlund had my 98 CD and we had to go get it. So we all proceeded to my brothers house 212 So 32nd St. Tacoma. On the way my sister indicated that she needed to do a load of laundry that had been remaining in her trunk most of the day. I proposed that she drop me off at my brothers and that I would get a ride from my brother to the laundry mat [sic] on 38th street just up from Jublies. After my sister dropped me off at my brothers and left I discovered he was not home, so I left him a note indicating I stopped by around 7:40p.m. and that I would call him later. (See copy of note attached). After waiting around for a few minutes I left my brothers walking headed for the laundry mat [sic] to catch my sister.
[Describing his subsequent arrest at the Laundromat].
Plaintiff's Exh. 112.
[3] CrR 4.7(b)(2)(vi) provides:

[S]ubject to constitutional limitations, the court on motion of the prosecuting attorney or the defendant, may require or allow the defendant to:
. . . .
(vi) permit the taking of samples of or from the defendant's blood, hair, and other materials of the defendant's body including materials under the defendant's fingernails which involve no unreasonable intrusion thereof[.]
See also Gilbert v. California, 388 U.S. 263, 266, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) (taking of handwriting exemplar did not violate fifth amendment privilege against self-incrimination); Schmerber v. California, 384 U.S. 757, 761, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (fifth amendment privilege against self-incrimination did not apply to order requiring withdrawal of blood sample; privilege applies only to evidence of a testimonial or communicative nature).
[4] The Castillo court did not use the word "suppress" to refer to a proper motion to suppress. 615 F.2d at 885. Of course, a suppression motion has a constitutional basis and is not admissible as evidence of a consciousness of guilt.
[5] The State argued, in part, as follows:

[Nordlund] refuses to have his body hair plucked. He refuses. Why does he refuse? If you're a completely innocent man, you have no idea what is going on. You don't know why they're trying to pluck your hair. You have no idea why they're trying to collect your body hair. You have no idea. You're totally innocent. Why would you refuse to have your body hair plucked? Act of an innocent man, or act of a guilty man who knows that the ski mask was tucked in his waist? Because, remember, [D.T.] testified that he pulled it out of his waist area. He knows where it was carried. He knows what might be found on that ski mask. Coincidence, or just another piece of evidence in the chain that links him to the man who attacked these girls?
15 RP at 1655-56.
[6] Currently codified at RCW 9.94A.030(32).
[7] Recodified at RCW 9.94A.525(4).