FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2014 JAN 21 AM 11: 34



IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | NO. 68759-0-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL SHANE CATES, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: |
| | ) | |

LAU, J. — Michael Shane Cates appeals his convictions for two counts of first degree child rape and two counts of child molestation. He contends (1) the court violated his Sixth Amendment right to confrontation by permitting a State witness to testify via video link and (2) the court erred in imposing a community custody provision permitting a community corrections officer (CCO) to search his home and computer. Cates raises other issues in a pro se statement of additional grounds (SAG). Finding no error, we affirm.

## FACTS

In December 2009, 15-year-old MS told his mother that a family friend, Michael Cates, had sexually abused him over a period of several months when MS was 6 or 7

years old. MS said the abuse occurred when Cates temporarily lived with MS's family in Lake Stevens in 2001.

At trial, MS's father testified that he knew Cates when both men were in Job Corps in New Mexico in the 1990s. MS's father later moved the family to Washington state. Cates called in 2001 and said he was "down on his luck," and MS's father allowed him to stay in the family's Lake Stevens home. Report of Proceedings (RP) (Jan. 24, 2012) at 212. Cates lived with MS's family for approximately six to nine months.

MS testified that the abuse started about a month after Cates moved in. According to MS, Cates repeatedly anally raped him. MS also described one or two occasions involving oral sex. These occasions were separate from the many instances of anal rape. MS described in detail the rape and oral sex instances, including the positions he and Cates took and the physical sensations MS experienced.

Cates was an alcoholic. MS's father testified that Cates "was a daily heavy drinker" and consumed alcohol every day. RP (Jan. 24, 2012) at 218. MS's mother testified that "any time he wasn't working, he was drinking." RP (Jan. 25, 2012) at 336. When MS's family went to New Mexico for two weeks to visit MS's grandmother, MS's father told Cates to move out by the time they returned. When the family returned home, Cates was gone but the house was in disarray with "beer cans all over [the] house, dirty, broken dishes all over the house, cigarette burns in a newly laminated floor throughout the entire house, garbage strung throughout the house." RP (Jan. 24, 2012) at 221. MS had no further contact with Cates.

MS's parents never noticed anything unusual about Cates's relationship with MS or any changes in MS's behavior while Cates lived with them. In the ensuing eight years, MS never told anyone about the abuse because he was afraid and ashamed. He feared his friends and family would look at him and his sexuality differently if they knew what had happened.

In late 2009, when MS was 15, his 12-year-old sister KS revealed that a cousin had molested her. MS's mother asked MS if anything like that had ever happened to him. MS then disclosed the abuse by Cates because he wanted to support his sister by letting her know the same thing had happened to him and because he was tired of "holding it in, just all my emotions building up, it was too much for me to handle at that point." RP (Jan. 24, 2012) at 123; RP (Jan. 25, 2012) at 347-48.

Although initially reluctant, MS ultimately agreed to give a statement to police. MS's mother contacted Lake Stevens police. Officer James Wellington interviewed MS. Officer Wellington determined Cates was living in Springfield, Missouri and contacted authorities there.

Springfield detectives interviewed Cates at the Missouri Probation and Parole Office. Cates denied the allegations. According to Missouri Police Detective Robert McPhail, Cates was nervous, sweating, and shaking when the interview started. Cates relaxed as the interview turned to his time living with MS's family in Lake Stevens. But when questioning focused on whether Cates had ever spent time alone with the S family children, he grew nervous and started sweating and shaking again.

The State charged Cates with two counts of first degree child rape and two counts of first degree child molestation. The parties stipulated to the admissibility of

Cates's statements to detectives in Missouri. The parties also agreed, after some discussion, to admission of a redacted transcript of the Missouri interview. As discussed more fully below, Detective McPhail flew to Washington for trial, but inclement weather delayed the proceedings and the detective returned to Missouri before the trial began. He testified the following week by two-way video link from Missouri.

Given the lapse of time, local police decided not to refer MS for a physical examination. However, the prosecutor's office later requested a physical examination. Nurse practitioner and clinical coordinator Barbara Haner of the Providence Intervention Center for Assault and Abuse physically examined MS's anus. Haner noted three unusual features: immediate dilation (absence of the normal "winking" reflex), "cuff-like" rugae, and a fissure (tear) with redness or irritation. RP (Jan. 26, 2012) at 432-35, 457. Haner testified that her examination was "nonspecific," meaning the unusual features "could have been caused by a lot of things including sexual assault." RP (Jan. 26, 2012) at 436-37. She further explained that "nonspecific" meant she could not make a conclusive statement, but she could not discount or exclude sexual abuse.

Cates did not testify at trial. The jury convicted Cates as charged, and the court sentenced him within the standard range. Cates appeals.

ANALYSIS

Confrontation Clause

For the first time on appeal, Cates contends that the trial court violated his Sixth Amendment right to confrontation by allowing Detective McPhail to testify by two-way

video link. The State responds that Cates waived this challenge by agreeing to the procedure at trial.

### Relevant Facts

In December 2011, trial was continued to Friday, January 13, 2012, "subject to the availability of the State's witnesses." Monday, January 16, was Martin Luther King Day. When the parties appeared before the assigned trial judge on Tuesday, January 17, the judge discussed likely delays because of inclement weather impacting the available jury pool. Defense counsel noted she had discussed the weather situation with the prosecutor. The State explained it had two out-of-state witnesses—MS's father and Detective McPhail—flying into Seattle that day. It was snowing during the proceedings, and the court and parties agreed to suspend proceedings for the remainder of Tuesday and Wednesday and to try again on Thursday, January 19, with a new jury pool. The court noted that with 8 to 10 inches of snow predicted, trial might not begin on Thursday either.

On Thursday, January 19, the parties reconvened to discuss the weather situation. It was still snowing that day. Detective McPhail was present in court but had to be back in Missouri by Friday evening because of a child care issue. The following colloquy regarding Detective McPhail's testimony occurred:

> [THE COURT]: I know there was some discussion of having Detective McPhail testify by video deposition. Is that still a possibility?
> MR. OKOLOKO: The most pressing issue for the State is Mr. McPhail's testimony. As I sit here today and on my e-mail, he has to be back in Missouri by Friday evening due to a child care issue that he's got going on in Missouri. What I have discussed with Mr. McPhail and counsel, Ms. Dingledy, are two options. Some time this afternoon we can do a video deposition of the Detective, and have that admitted during the trial and published to the jury. The second is that

we could call Detective McPhail out of order today, have him take the stand and testify based on a stipulation between the parties.

THE COURT: We don't have a jury today.

MR. OKOLOKO: That's what I'm saying. He would be testifying outside the presence of the jury. It will be videotaped in an open courtroom with a court reporter in here.

THE COURT: So what you are suggesting is that - - the other way of doing the video deposition would be actually in session?

MR. OKOLOKO: In session. That way you can make rulings on objections. The third option would be Detective McPhail returns back to Missouri and we can have him in the trial by way of either Skype or like we've done I have done in a different trial in Judge Castleberry's department, the witness participated by conference call. Obviously, that was based on a stipulation of the parties agreeing to have the witness phone in and the defendant waiving his right to have the witness present in the courtroom. Those are three options.

THE COURT: Ms. [Dingledy], have you had a chance to discuss any of this with your client? If you haven't, we'll give you a chance.

MS. DINGLEDY: We've discussed it and we're discussing it at present.

THE COURT: If you need an opportunity to discuss it without all of us overhearing the conversation.

MS. DINGLEDY: Quite frankly, what I would love is a recess.

RP (Jan. 19, 2012) at 56-58.

The court took a recess and then continued the discussion:

THE COURT: Please be seated. And so let me start here. Any chance you've agreed on an approach to Detective McPhail's testimony?

MS. DINGLEDY: I think we have, Your Honor. I think that it would be wiser to try to do this by video link or if all else fails - -

THE COURT: I don't have any problem with that idea. We at least have some notice so I can talk to Mr. Shambro in our administrative office about how to set it up. We have done it before in the courthouse with a Skype.

MR. OKOLOKO: That's the defense's preference. The State will be going with that. At this point in time, I will have a stipulation that we'll file in court to show that the parties agreed to proceed by this medium. I think we settled on Detective McPhail's testimony.

RP (Jan. 19, 2012) at 59 (emphasis added).

Cates's counsel asked to briefly interview Detective McPhail before he returned

to Missouri, which the State agreed to facilitate. The court and parties agreed to start

anew on Monday, January 23.

On Tuesday, January 24 (after voir dire on Monday), the State confirmed that Detective McPhail would testify by video link the following morning. The court indicated it would have a technician and equipment ready.

On Wednesday, January 25, before Detective McPhail's testimony, the parties discussed admission of an ultimately agreed transcript of the Springfield interview that Detective McPhail would refer to in his testimony. RP (Jan. 25, 2012) at 253-59; Ex. 8B (admitted at RP (Jan. 25, 2012) at 276-77); see also RP (Jan. 25, 2012) at 467-72 (final wording of stipulation). The parties had previously agreed to the admissibility of Cates's statements to Detective McPhail. The court, parties, and technician discussed the video hookup logistics. RP (Jan. 25, 2012) at 259 (use of split screen, where parties should stand, and witness in view of jury). Before the detective testified, the court explained to the jury that the reason for this procedure was the previous week's snowstorm. Detective McPhail testified as described above. On cross-examination, defense counsel elicited Detective McPhail's testimony that it was fairly common for people to be nervous when talking to a police officer and that Cates's behavior at the beginning of the interview was not necessarily unusual.

Analysis

The confrontation clauses of the state and federal constitutions guarantee the right of an accused to confront witnesses against him or her. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. "The right to face-to-face confrontation under the federal and state confrontation clauses, while a fundamental and important right of the accused, is not absolute." State v. Foster, 135 Wn.2d 441, 473, 957 P.2d 712 (1998). "The [United States] Supreme Court has indicated 'a preference for face-to-face confrontation [with

witnesses] at trial,' acknowledging 'that such confrontation is [not] an indispensable element of the Sixth Amendment's guarantee of the right to confront one's accusers.'" State v. Davis, 141 Wn.2d 798, 846, 10 P.3d 977, 101 P.3d 1 (2000) (alterations in original) (internal citations omitted) (quoting Maryland v. Craig, 497 U.S. 836, 849-50, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990)).[1] "This preferred right of physical presence, or 'face-to-face' confrontation, may be dispensed with only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." Foster, 135 Wn.2d at 457 (quoting Craig, 497 U.S. at 850).

A defendant can waive a fundamental constitutional right if he or she "'intentional[ly] relinquish[es] or abandon[s] a known right or privilege.'" State v. Thomas, 128 Wn.2d 553, 558, 910 P.2d 475 (1996) (quoting Johnson v. Zerbst, 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 2d 1461 (1938), overruled on other grounds by Edwards v. Arizona, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981)). Stated another way, a defendant's waiver is valid if done knowingly, voluntarily, and intelligently. Thomas, 128 Wn.2d at 558. The right to confront witnesses falls into the category of rights that trial counsel can waive as a matter of trial strategy without the defendant's personal expression of waiver. State v. O'Cain, 169 Wn. App. 228, 244-45, 279 P.3d 926 (2012) ("As with decisions implicating trial strategy, the decision to raise a confrontation clause objection is a determination that is reserved to the discretion of

---

[1] In Craig, the Court held that a preference for face-to-face confrontation "'must occasionally give way to considerations of public policy and the necessities of the case.'" Craig, 497 U.S. at 849 (quoting Mattox v. United States, 156 U.S. 237, 243, 15 S. Ct. 337, 39 L. Ed. 409 (1895)).

competent defense counsel."); <u>Wilson v. Gray</u>, 345 F.2d 282, 287-88 (9th Cir. 1965) (holding that the right to confrontation was waived by trial counsel's stipulation to the matter being heard based on the transcript of the preliminary hearing); <u>see also</u> <u>Thomas</u>, 128 Wn.2d at 559-60 (stating that the right to confrontation is similar to the right to testify, right not to testify, and right to self-representation in that it can be waived by counsel).

Here, in Cates's presence and without any objection on his part, defense counsel agreed that Detective McPhail could testify from Missouri via two-way video link. The record clearly indicates that under the circumstances of the case at the time of trial, counsel's decision was deliberately made as a matter of trial tactics and strategy. Cates waived his right to face-to-face confrontation.[2]

---

[2] Cates also argues that the court's failure to make findings under the two-part test set forth in <u>Craig</u> (important public policy and reliability) was manifest constitutional error under RAP 2.5(a). This argument fails for at least two reasons. First, Cates relies on cases where, unlike here, the accused objected to video testimony. Second, any error here was clearly invited. The invited error doctrine "prohibits a party from 'setting up error in the trial court and then complaining of it on appeal.'" <u>State v. Armstrong</u>, 69 Wn. App. 430, 434, 848 P.2d 1322 (1993) (quoting <u>State v. Young</u>, 63 Wn. App. 324, 330, 818 P.2d 1375 (1991)). "Even where constitutional rights are involved, invited error precludes appellate review." <u>State v. Alger</u>, 31 Wn. App. 244, 249, 640 P.2d 44 (1982). As discussed above, Cates explicitly agreed to the two-way video link procedure.

We further note that although Detective McPhail was not physically present in the courtroom, he testified by two-way video link in front of Cates and the jury in real time. The record confirms he was subjected to meaningful cross-examination. Cates lodged timely and pertinent objections. Moreover, as discussed above, Cates stipulated to a redacted transcript of the same interview Detective McPhail recounted during his testimony. Detective McPhail's testimony added only Cates's demeanor during the interview (nervous and shaking). On cross-examination, defense counsel successfully elicited the detective's testimony that, in his experience, it was not uncommon for people who have done nothing wrong to behave nervously when questioned by police.

Conditions of Supervision

Cates assigns error to a community custody provision included in his judgment and sentence. The challenged condition reads: "You must consent to [Department of Corrections] home visits to monitor your compliance with supervision. Home visits include access for the purposes of visual inspection of all areas of the residence in which you live or have exclusive/joint control/access, to also include computers which you have access to." Cates argues this condition violates article I, section 7 of the Washington Constitution and the Fourth Amendment of the United States Constitution. The State contends that under State v. Massey, 81 Wn. App. 198, 913 P.2d 424 (1996), Cates's challenge to the community custody provision is not ripe for review.

The unconstitutionality of a community custody condition is not ripe for review unless the person is harmfully affected by the part of the condition alleged to be unconstitutional. Massey, 81 Wn. App. at 200. To the extent Cates challenges the condition's home visit component, Massey is dispositive of this issue. Under Massey, the community custody condition Cates challenges here is not ripe for review until Cates is subjected to an improper search. Massey, 81 Wn. App. at 199-200. Cates's challenge to this provision is premature, and we decline to address it.

However, Cates also challenges the condition's computer inspection component. He argues this condition (1) is not crime related and (2) "is unconstitutionally overbroad because it chills Mr. Cates's First Amendment right to use a computer to store his 'records, reflections, and conversations.'" Appellant's Br. at 28 (quoting State v. Nordlund, 113 Wn. App. 171, 181-82, 53 P.3d 520 (2002)).

Trial courts have discretion to impose "crime-related prohibitions" as conditions of community custody. Former RCW 9.94A.700(5)(e) (2003). We agree with Cates that the record contains no evidence indicating he used a computer to perpetuate the crime for which he was convicted. In fact, the court struck proposed condition 13—which would have barred Cates from possessing or accessing a computer without CCO approval—due to the court's concern that no evidence showed Cates's crime involved computers. RP (April 24, 2012) at 615 (sentencing hearing); Clerk's Papers at 18 (judgment and sentence showing condition 13 crossed out). At the sentencing hearing, the court clarified that the computer search provision was part of the routine monitoring meant to ensure Cates complied with other unchallenged conditions:

> I won't impose [prohibition 13], but [Cates] will have to allow his CCO to have access to any computer used by him, and if he has found - - if there is any evidence that he is using if for improper purposes contacting children or accessing sexually explicit information or other materials that he's already prohibited from, then he will be prohibited from using it. I will indicate that he can use a computer so long as it is subject to a search on request by his CCO, and if there is evidence that he's committing any violation by use of the computer, he will lose this right.

RP (April 24, 2012) at 615.[3]

We agree with the trial court that the computer search provision is a monitoring condition, not a prohibition. It does not prohibit or otherwise restrict Cates's use or possession of computers. Cates does not challenge his other community custody conditions, including condition 6 (barring him from possessing or accessing sexually

---

[3] At the sentencing hearing, Cates objected to condition 7 (barring him from possessing or accessing sexually explicit materials) on overbreadth grounds. The court found that under State v. Bahl, 164 Wn.2d 739, 193 P.3d 678 (2008), while "pornography" was overbroad, "sexually explicit materials" was not. RP (April 24, 2012) at 616-17. Cates assigns no error to condition 7 on appeal.

explicit materials). The home and computer search provision is a means for the State to monitor Cates's compliance with this, and other, conditions.

We next consider Cates's First Amendment argument. "[A] convicted defendant's constitutional rights during the period of community custody placement are subject to the infringements authorized by the Sentencing Reform Act of 1981." State v. Combs, 102 Wn. App. 949, 953, 10 P.3d 1101 (2000) (citations omitted). "[C]onditions may be imposed that restrict free speech rights if reasonably necessary, but they must be sensitively imposed." State v. Bahl, 164 Wn.2d 739, 757, 193 P.3d 678 (2008). However, the appropriate standard of review for a sentencing condition is abuse of discretion, even where the sentencing condition infringes on a fundamental right. In re Pers. Restraint of Rainey, 168 Wn.2d 367, 374-75, 229 P.3d 686 (2010).

The condition challenged here does not restrict or limit Cates's computer use. The condition also limits the scope of computer searches in that it requires Cates to consent to such searches "to monitor [his] compliance with supervision." RCW 9.94A.631's plain language expressly authorizes a search of a probationer's "person, residence, automobile, or other personal property" without a warrant if the CCO has reasonable cause to believe that the probationer violated a condition of the sentence. In Massey, we concluded that whether a community custody order expressly states so or not, "the standard for adjudicating a challenge to any subsequent search remains the same: Searches must be based on reasonable suspicion." Massey, 81 Wn. App. at 201 (emphasis added). The trial court did not abuse its discretion in

imposing the computer search condition, and Cates's challenge is not ripe until he is subjected to an unreasonable search.[4]

Statement of Additional Grounds (SAG)

Cates raises two issues in his pro se SAG. He first argues that insufficient evidence supports his convictions. He specifically claims, "There was no physical evidence and the testimony of a teenager recalling things that never occurred from 10 years earlier should not be enough to put someone in prison for 25 yrs." SAG at 3. To the extent Cates argues the only evidence was "[his] word against a teenager's word and his father," SAG at 1, he essentially contests witness credibility and evidence persuasiveness at trial. We defer to the trier of fact on issues of conflicting testimony, witness credibility, and persuasiveness of the evidence. State v. Fiser, 99 Wn. App. 714, 719, 995 P.2d 107 (2000). Given the fact finder's opportunity to assess witness demeanor and credibility, we will not disturb those findings. See State v. Pierce, 134 Wn. App. 763, 774, 142 P.3d 610 (2006). Viewing the evidence in the light most favorable to the State, we conclude a rational jury could have found Cates guilty of first degree child rape and child molestation beyond a reasonable doubt.

Cates also argues counsel was ineffective because she (1) failed to object to admission of evidence showing he was on parole, (2) suggested to the jury that he was

---

[4] Cates cites Nordlund for the proposition that "'the search of a computer has First Amendment implications that may collide with Fourth Amendment concerns.'" Appellant's Br. at 27 (footnote omitted) (quoting Nordlund, 113 Wn. App at 182). In Nordlund, the defendant claimed that affidavits submitted to support search warrants were insufficient to justify seizure and search of his personal computer. Nordlund, thus, addressed whether the State demonstrated probable cause to seize and search the computer. Here, Cates has not yet been subjected to a search. His reliance on Nordlund is premature.

probably guilty, (3) made him take notes while she questioned his accuser during trial, (4) rushed him into trial and failed to inform him it was important that he testify, and (5) failed to ask him if he had any witnesses and failed to follow up on a claimed alibi. To establish ineffective assistance of counsel, Cates must show both deficient performance and resulting prejudice. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). There is a strong presumption of effective representation. State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Matters that go to trial strategy or tactics do not show deficient performance, and Cates bears the burden of establishing there were no legitimate strategic or tactical reasons behind his attorney's choices. State v. Rainey, 107 Wn. App. 129, 135-36, 28 P.3d 10 (2001).

Here, counsel's decisions regarding objections and whether to call particular witnesses to testify constitute trial tactics. Cates fails to show that counsel lacked proper strategic or tactical reasons for her choices. Our review of the record reveals no support for Cates's claim that defense counsel suggested to the jury that he was guilty or told the jury he was "an extremely talented abuser," SAG at 2. Cates reads his counsel's statements out of context. See RP (Jan. 26, 2012) at 533-49 (defense counsel's closing argument). Further, nothing in the record supports Cates's claims that counsel made him take notes during trial, rushed him into trial, or failed to follow up on a claimed alibi. We decline to review these claims. State v. Wheaton, 121 Wn.2d 347, 365, 850 P.2d 507 (1993) (declining to review issues due to "inadequate record and inadequate argument").

## CONCLUSION

We affirm the judgment and sentence.

_____
Fay, J.

WE CONCUR:

_____
Cox, J.

_____
Becker, J.